Monte D. **TUCKER**, Plaintiff–Appellant,

v.

**STATE OF CALIFORNIA DEPARTMENT OF EDUCATION; James L. Phillips; Maria R. Balakshin; Terry Proschold, Defendant–Appellees.**

No. 94–16267.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1995.

Decided Oct. 4, 1996.

---

Steven R. Burlingham, Gary, Till & Burlingham, Sacramento, CA, for plaintiff-appellant.

Joyce O. Eckerm, California State Department of Education, Sacramento, CA, for defendant-appellees.

Steven R. Burlingham, Gary, Till & Burlingham, The Rutherford Institute, Sacramento, California, for plaintiff-appellant.

Joyce O. Eckerm, California State Department of Education, Sacramento, California, for defendant-appellees.

Before: BOOCHEVER, REINHARDT, Circuit Judges, and KING, District Judge.*

REINHARDT, Circuit Judge:

Monte Tucker, the plaintiff-appellant, is a deeply religious man who works as a computer analyst in the California State Department of Education. He contends that orders promulgated by his supervisors that forbid employees in his division from engaging in any oral or written religious advocacy in the workplace and displaying any religious artifacts, tracts or materials outside their offices or cubicles violate his rights to freedom of speech guaranteed by the First Amendment. Although the government may have legitimate interests in preventing a number of the activities in which Tucker has engaged or wants to continue to engage, the challenged orders are overbroad and impermissibly infringe on First Amendment rights. Accordingly we reverse the district court order granting summary judgment for the government and direct that summary judgment be issued in favor of Tucker.

**FACTS AND PROCEDURAL HISTORY**

Tucker has worked as a computer analyst for the State Department of Education since 1977. He is currently employed in the Child Nutrition and Food Distribution Division. His religious beliefs command him to give credit to God for the work he performs. In 1988, he decided to comply with this command by placing the phrase "Servant of the Lord Jesus Christ" and the acronym "SOTLJC" after his name on the label of a software program he was working on. The program, with the acronym, was distributed within the department. Tucker began placing the acronym on other material he was working on. Shortly thereafter, his supervisor, James Phillips, instructed him not to use the acronym. After a series of orders and warnings, Tucker was suspended for five days in May 1988.

On June 9, 1988 Tucker met with a number of his supervisors, including Phillips and Maria Balakshin, who gave him the following orders:

1. You are to refrain from using a name, acronym, or symbol with religious connotations on any document in the work place. This prohibition of the use of religious names, acronyms or symbols in the work place applies but is not limited to:

 a). all written correspondence (letters/memorandums)[sic] prepared in either draft or final format on State letterhead or plain paper.

 b). any written correspondence circulated within your work unit, division, branch or department.

 c). all data keyed into the computer (including logos on computer software applications)

2. You are to refrain from initiating or promoting religious discussions during the course of your work day. Breaks and lunch periods are excluded, provided such prohibited activity takes place outside the work place.

3. You are to refrain from displaying or promoting religious books, pamphlets, tracts, brochures, pictures, etc., outside the inner perimeter surfaces of the partitions that define your office space.

On February 7, 1989 Balakshin issued the following orders to all employees of the Child Nutrition and Food Distribution Division, including Tucker, which provide that they may not:

1. Store or display any religious artifacts, tracts, information or other materials in any part of the workplace other than in their own closed offices or defined cubicles;

---

* The Honorable Samuel P. King, United States District Judge for the District of Hawaii, sitting by designation.

2. Engage in any religious advocacy, either written or oral, during the work hours or in the workplace.

3. Place any personal acronym, title, symbol, logo, or declaration unrelated to the business of the Department on any official communication or work product.

In May 1989 Tucker filed an action in federal district court against the California Department of Education and his supervisors alleging both constitutional and statutory (Title VII) causes of action. In 1990 the district court denied Tucker's motion for a preliminary injunction. In April 1991 the court granted partial summary judgment for the defendants on the question of Tucker's facial challenge to the constitutional validity of the department's orders and denied summary judgment on the Title VII claim. In 1994, the parties stipulated to the dismissal of Tucker's remaining unadjudicated claims under Federal Rule of Civil Procedure 41(a), and the court directed the clerk to enter judgment for the defendants. Tucker filed a timely appeal in which he challenges the validity of two of the February 7, 1989 orders.[1]

## I. THE ORDER BANNING RELIGIOUS ADVOCACY

■ We consider first the order banning religious advocacy, written or oral, in the workplace.[2] Both in their briefs and at oral argument the parties disagreed as to the relevant cases and doctrinal framework to be applied to the issues before us. The parties both discuss areas of First Amendment jurisprudence that are of no relevance in addition to those that are directly applicable. Although we must look to the most appropriate precedent and doctrine, we are also aware of the dangers of reducing the First Amendment to a series of doctrinal cubbyholes and of warping different fact situations to fit into the boxes we have created. "First Amendment doctrines are manifold, and their diverse facts and analyses may reveal but one consistent truth with respect to the amendment—each case is decided on its own merits." *Bishop v. Aronov,* 926 F.2d 1066, 1070 (11th Cir.1991), *cert. denied,* 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992).

■ Our first step is to try to separate the doctrines that are applicable here from those that are not. Tucker contends that the orders must pass strict scrutiny because the government has created a limited purpose public forum in its offices by allowing its employees both to discuss "public questions when they assemble informally at their desks, drinking fountains, lunch rooms, copy machines, etc." and to display written materials in and around their offices and cubicles. We reject that argument. In *Cornelius v. NAACP Legal Defense Fund,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985), the Court stated, "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by *intentionally* opening a nontraditional forum for public discourse." (emphasis added). Assuming that Tucker and his co-workers talked about whatever they wanted to at work (before the passage of the challenged order), and that they posted all sorts of materials on the walls, that still would not show that the government had intentionally opened up the workplace for public discourse.

■ We also reject the state's argument that the orders should be considered time, place and manner restrictions. The time,

---

**1.** Tucker does not challenge the February 7, 1989 order banning the use of acronyms on official department work or any of the June 9, 1988 orders. He apparently accepts the February 7, 1989 acronym ban, and the state has represented that it will not seek to enforce the June 9, 1988 orders if we invalidate the orders appealed here.

Tucker's complaint raises a federal question and the district court had jurisdiction under 28 U.S.C. § 1343. He is challenging the substance of the April 1991 grant of partial summary judgment. While partial summary judgment is generally not a final appealable order, we have jurisdiction under 28 U.S.C. § 1291 because the July 22, 1994 district court order dismissing the remaining unadjudicated claims and entering final judgment constitutes an appealable final judgment.

**2.** The determination of whether public employee speech is protected under the First Amendment is a question of constitutional law that we review *de novo. Hyland v. Wonder,* 972 F.2d 1129, 1134 (9th Cir.1992), *cert. denied,* 508 U.S. 908, 113 S.Ct. 2337, 124 L.Ed.2d 248 (1993). When the district court upholds a restriction on speech as constitutional, we conduct a *de novo* review of the facts. *Daily Herald Co. v. Munro,* 838 F.2d 380, 383 (9th Cir.1988).

place and manner test is only applicable to speech regulations that are content neutral. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). Because the orders here regulate only a certain type of expression, based on its *content*—religious expression—they are not content neutral. *Id.* (stating that restrictions on expression are content neutral if they are "justified without reference to the content of the regulated speech").

■ The state also cites cases that concern the Free Exercise Clause and appears to argue that we should analyze the orders as generally applicable restrictions that incidentally restrict Tucker's religious practice. This argument is also obviously wrong. These orders are no more "generally applicable" regulations that incidentally burden Tucker's exercise of religion than they are content neutral speech regulation: they specifically target religious speech and no other.

■ Finally, we reject the state's contention, which it makes without citing any supporting cases, that employee speech about religion is not on matters of public concern and thus is not protected workplace speech. This circuit and other courts have defined public concern speech broadly to include almost *any* matter other than speech that relates to internal power struggles within the workplace. *E.g., Gillette v. Delmore,* 886 F.2d 1194, 1197 (9th Cir.1989) ("Speech that can fairly be considered as relating to any matter of political, social, or other concern to the community is constitutionally protected.") In *National Treasury Employees Union v. United States,* 990 F.2d 1271 (D.C.Cir.1993), *aff'd in relevant part, rev'd in part on other grounds,* —— U.S. ——, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), the D.C. Circuit wrote:

> The contrast, [between public concern speech and non-public concern speech], then was between issues of external interest as opposed to ones of internal office management. Accordingly, we read the "public concern" criterion as referring not to the number of interested listeners or readers but to whether the expression relates to some issue of interest beyond the employee's bureaucratic niche.

*Id.* at 1273 (citation omitted); *see also McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983) ("Speech by public em-

ployees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances.") (citations omitted) The Supreme Court has also made it clear that an employee need *not* address the public at large, for his speech to be deemed to be on a matter of public concern. *See Rankin v. McPherson,* 483 U.S. 378, 384–87, 107 S.Ct. 2891, 2896–99, 97 L.Ed.2d 315 (1987) (employee statement made only to co-worker concerning President Reagan was speech on a matter of public concern). Here, the speech is religious expression and it is obviously of public concern.

■ Casting these red herrings aside, we look instead to applicable doctrine, which is found in the case law governing employee speech in the workplace. In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Court made it clear that employees could not be forced to relinquish their First Amendment rights simply because they had received the benefit of public employment. Nevertheless, the Court recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568, 88 S.Ct. at 1734. Despite the government's greater interest in regulating workplace speech, when it restricts such speech it bears the burden of justifying its action, *Johnson v. Multnomah County,* 48 F.3d 420, 422 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2616, 132 L.Ed.2d 858 (1995), and its interests must outweigh those of the employee. *Id.*

■ Most of the workplace speech cases involve disciplinary action taken by an employer in response to statements by employees. Here, however, Tucker challenges the validity of orders that apply to all the employees of the division and ban all speech on a broad and important topic. It is clear that the government's burden when seeking to justify a broad deterrent on speech that affects an entire group of its employees is greater than when it is defending an individ-

ual disciplinary decision. *National Treasury Employees Union*, —— U.S. ——, ——, 115 S.Ct. 1003, 1014, 130 L.Ed.2d 964 (1995) ("[U]nlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens."); *see also NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963) ("Broad prophylactic rules in the area of free expression are suspect.") (citations omitted). In cases involving a broad ban on group speech, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Treasury Employees*, —— U.S. at ——, 115 S.Ct. at 1014 (quoting *Pickering*, 391 U.S. at 571, 88 S.Ct. at 1736). This is indeed an exacting standard.

### The State's Asserted Interests

The state asserts a number of interests to justify its order prohibiting religious advocacy: (i) promoting the efficiency of the workplace, (ii) protecting the "liberty interests" of other employees not to be subjected to religious advocacy, (iii) "meeting the expectations of the taxpayers that their tax dollars are being used to support legitimate State business and not to promote religion,"; (iv) fulfilling its duty to comply with the Establishment Clause of the United States Constitution; and (v) fulfilling its duty to comply with the religion clauses of the California Constitution. We conclude that the state has failed to demonstrate that its "interests" are substantial, individually or in combination, or that they outweigh the employees' interests in free expression. Nor has it made any showing that the expression to be prohibited has a "necessary [adverse] impact on the actual operation of the government."

### i. The State's Asserted Efficiency Interest

▆▆▆ We first consider the state's asserted interest in "efficiency." The government

has failed to show that its broad ban on religious advocacy is necessary to further its interest in discipline and efficiency. In the first place, it makes at most only a minimal showing that one individual's speech has disrupted the workplace, or threatens to do so. *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1407 (9th Cir.1988). The district court based its efficiency decision in large part if not entirely on the fact that Phillips, Tucker's immediate supervisor, "has had to devote" "hundreds of hours to plaintiff's religious conduct," principally to the acronym issue. The only other evidence in the record going to real or threatened disruption in the workplace is Phillips' statements that only he had "been impacted" by Tucker's use of a religious acronym and that the orders were handed down in response to "what might occur in the future, what Monte [Tucker] might do."

We conclude that the time spent by Tucker's supervisor trying to restrict his religious speech does not constitute disruption. It affected only the supervisor himself, did not threaten morale in the department generally and for the most part did not concern the issues involved in the two orders before us. The separate order regarding acronyms remains in effect and is not challenged in this appeal.[3] In addition, it was part of the supervisor's regular functions to deal with problems of this nature. In any event, the time Phillips spent dealing with Tucker's expressive behavior cannot justify imposing a ban on religious advocacy by all employees. There is not only no evidence of disruption in general, but there is no evidence that any employee other than Tucker ever engaged in any kind of "religious advocacy." In short, the government has utterly failed to justify its broad prohibition on efficiency grounds. *See Roth*, 856 F.2d at 1407; *cf. National Treasury Employees*, —— U.S. at —— – —— and ns. 11 and 21, 115 S.Ct. at 1017–18 and ns. 11 and 21.

**3.** The government has not set forth facts tending to show that Tucker spent more time than other employees in non-work related conversation, or that "advocacy" or use of religious acronyms diverted him from doing his job effectively. If

the government had made such a showing, it might provide the basis for disciplinary action against Tucker but still not the broad orders challenged here.

### ii. The State's Asserted Interest in Protecting Its Employees' Interests

 The state asserts that it has an interest in protecting the liberty interests of its employees, but it never explains exactly what these liberty interests are. Nor does the state cite cases that speak to the existence of such an interest, much less cases that support its claim that this interest justifies restricting employee speech in advance by a flat ban against an entire category of speech. Moreover, there is no evidence in the record that any of his co-employees have complained about Tucker's speech, that any have complained about religious advocacy generally, or that any have asserted that their liberty interests have been affected in any way.

### iii. The State's Asserted Interest in Protecting the Taxpayers

 There is no basis in the record or otherwise for the state's asserted interest in protecting the public weal. Nor is there any evidence that the taxpayers' expectations that government money will be spent on the government's business, not on supporting religion, have been frustrated. There is no showing that any members of the public have been exposed to any religious speech or displays or expressed any concern or complained about Tucker or any other employee's conversations about religion or display of religious materials. Only Phillips, a supervisor, has spent any significant amount of the government's time dealing with Tucker's activities (and he, of course, was dealing mainly with the acronym issue.) Therefore, as in the case of the other assertions of the state's interests, the government has failed to meet its burden of showing that there is anything more than speculation or fancy to support its order banning religious advocacy. *Johnson,* 48 F.3d at 422 (government bears the burden of justifying a restriction on employee speech).

### iv. The State's Asserted Interest in Avoiding the Establishment of Religion

 The state primarily relies on its contention, which the district court found persuasive, that the order serves the state's compelling interest in remaining neutral on religious matters and avoiding the establishment of religion. It also argues that because the order concerns the Department of Education it is justified in light of the Supreme Court's special concern for maintaining church-state separation in public schools. The last point, which the state pressed vigorously at oral argument, is entirely specious.

While the Supreme Court has not considered the constitutionality of a flat ban on religious speech by and among employees who work in a government office, we have little doubt as to how it would rule. In a far more difficult case, the Court rejected the argument that allowing all student groups, including religious groups, to hold meetings on the campus of a public university has a primary effect of advancing religion. The Court stated such an "open-forum" policy does not confer any "imprimatur of state approval on religious sects or practices." *Widmar v. Vincent,* 454 U.S. 263, 273, 102 S.Ct. 269, 276, 70 L.Ed.2d 440 (1981). In *Rosenberger v. University of Virginia,* —— U.S. ——, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), the Court said that there must be a "plausible fear" that the speech in question would be attributed to the state, and rejected an Establishment Clause argument because there was "no real likelihood" that the speech would seem to be "either endorsed or coerced by the State." *Id.* at ——, 115 S.Ct. at 2523. The challenged regulation here prohibits all sorts of employee speech that could in no way create the impression that the state has taken a position in support of a religious sect or of religion generally. For example, if one employee suggested to another during the course of a private conversation at the office that he should consider being baptized or circumcised, or, while at his work station, wrote a letter to his sister suggesting that she enter a convent or convert to Judaism, his conduct would not carry or give the impression of carrying the impermissible "imprimatur of state approval on religious sects or practices." In fact, most of the conduct covered by the orders is speech that could in no way cause anyone to believe that the government endorsed it.

The state contends that as a result of the Supreme Court's particular concern about

church-state separation in schools, the order is justified because it applies to employees in the Department of Education. The truth is that the state has adopted a rule that might have some basis in reason if it applied to teachers acting in their role as teachers, or to department employees addressing the public in their official capacities; instead the state has made it applicable exclusively to the employees of a division that performs no educational function whatsoever. Quite plainly, the order does not apply to those persons in the department whose performance of their official duties has the most potential for creating public misperception of the state's role.

■ A teacher appears to speak for the state when he or she teaches; therefore, the department may permissibly restrict such religious advocacy. *See Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 522 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2640, 132 L.Ed.2d 878 (1995); *accord Bishop v. Aronov*, 926 F.2d at 1076. Similarly, the department may, at least under some circumstances, prevent at least some of its employees from advocating religion in the course of making public speeches on education. However, as the Fifth Circuit has recognized, speech by a public employee, even a teacher, does not always represent, or even appear to represent, the views of the state. *Texas State Teachers Assoc. v. Garland Indep. Sch. Dist.*, 777 F.2d 1046 (5th Cir.1985), *aff'd* 479 U.S. 801, 107 S.Ct. 41, 93 L.Ed.2d 4 (1986). In *Garland,* the court struck down a policy that prevented teachers from discussing the teachers' organization during non-class time. The court found no merit in the government's contention that the restriction was necessary to uphold the Texas Education Code's policy of "neutrality" towards groups and organizations. *Id.* at 1055.

What Tucker, a computer analyst in the Child Nutrition and Food Distribution Division, discusses in his cubicle or in the hallway with other computer analysts, clearly would not appear to any reasonable person to represent the views of the state. Certainly, nothing Tucker says about religion in his office discourse is likely to cause a reasonable person to believe that the state is speaking or supports his views. Allowing employees of the Child Nutrition and Food Distribution Division to discuss whatever subject they choose at work, be it religion or football, may incidentally benefit religion (or football), but it would not give the appearance of a state endorsement. There is simply no legitimate basis for the state's singling out the employees of the Child Nutrition and Food Distribution Division and subjecting them alone to an order prohibiting all advocacy of religion in the workplace on the ground that it is necessary to avoid the appearance that the state is favoring religion.

v. **The State's Asserted Interest in Complying with the Religion Clauses of the California Constitution**

■ The government also contends that its interest in meeting the California Constitution's command of "strict neutrality by public officials on matters of religion" justifies the orders. If the California courts had held that limitations on speech such as those challenged here are necessary in order to insure compliance with the California Constitution, we might be required to address the question whether a state interest derived from its constitution provides a legitimate justification to restrict employee speech protected under the First Amendment, or whether the Supremacy Clause precludes reliance on the state constitution.[4] We do not need to reach that issue, however, because we conclude that the state constitution neither requires nor justifies the ban at issue.

The California Constitution contains an establishment clause akin to that in the United States Constitution. In *Sands v. Morongo Unified Sch. Dist.*, 53 Cal.3d 863, 281 Cal.

---

4. The Supreme Court faced a similar issue in *Widmar v. Vincent.* 454 U.S. at 275–76, 102 S.Ct. at 277–78. The Court did not reach the broad question of whether a state interest derived from its constitution could "ever outweigh free speech interests protected by the Constitution." It sim-

ply held that in the case before it, where the Missouri courts had never ruled that an "open-forum" policy violated Missouri's Constitution, the state's interest was not sufficient to overcome the students' First Amendment rights. *Id.*

Rptr. 34, 809 P.2d 809 (1991), *cert. denied,* 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992), the California Supreme Court stated that federal cases interpreting the federal Establishment Clause provide guidance for interpreting the California Establishment Clause, but that the state courts must "independently determine its scope." *Id.* 281 Cal. Rptr. at 45, 809 P.2d at 820. The state constitution also contains a "no preference clause"[5] and a clause prohibiting any government appropriation for religion. Cal. Const. art. XVI, § 5. "The California courts have interpreted the no preference clause ... to require that not only may a governmental body not prefer one religion over another, it also may not *appear* to be acting preferentially." *Hewitt v. Joyner,* 940 F.2d 1561, 1567 (9th Cir.1991), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992). The highest state court has interpreted article XVI, § 5 to prohibit any official involvement that promotes religion. *Morongo,* 281 Cal.Rptr. at 45, 809 P.2d at 820. While the California Constitution imposes stricter prohibitions on government support of religion than does the Federal Constitution, *id.,* we find that difference of no consequence here.

The state has cited no case that supports its argument that the California Constitution justifies the Department of Education's banning the advocacy of religion in private discussions between co-workers in the Child Nutrition and Food Distribution Division.[6] And, because it appears to us that it would be unreasonable to do so, we do not believe that the California courts would so interpret the constitution. Based on the analysis that we have already explicated, we conclude that allowing employees to write or speak favorably in the workplace about religion would, at least in the large majority of instances, not be inconsistent with any of the state's duties under its constitution.

**Conclusion**

Because the state's justifications for the ban are meritless, we hold that its asserted

interests do not outweigh "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression". *Treasury Employees,* —— U.S. at ——, 115 S.Ct. at 1014. Nor does the banned expression have a "'necessary [adverse] impact on the actual operation of the Government.'" *Id.* (quoting *Pickering,* 391 U.S. at 571, 88 S.Ct. at 1736). Accordingly, we hold that the order violates the free speech clause of the Constitution.

## II. THE ORDER BANNING THE STORAGE OR DISPLAY OF ANY RELIGIOUS ARTIFACTS, TRACTS, INFORMATION, AND MATERIALS

■ Our analysis of the second challenged order, which prevents the display of religious materials outside employees' cubicles or offices, is similar to our analysis of the restrictions on religious advocacy. There are, however, important distinctions between restricting employees' speech at the workplace and prohibiting employees from using the state's walls, tables or other space to post messages or place materials. The government has a greater interest in controlling what materials are posted on its property than it does in controlling the speech of the people who work for it, especially when its employees are engaged in private conversation among themselves. There is a greater likelihood that materials posted on the walls of the corridors of government offices would be interpreted as representing the views of the state than would private speech by individual employees walking down those same corridors.

■ The interior walls of the offices of the Child Nutrition and Food Distribution Division are neither a public forum, nor a limited purpose public forum. *See Cornelius v. NAACP Legal Defense Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985);

---

**5.** Section 4 of article I guarantees "[f]ree exercise and enjoyment of religion without discrimination or preference."

**6.** The only case it cites concerning the California Constitution is *Vernon v. City of Los Angeles,* 27 F.3d 1385 (9th Cir.1994), which stands for the

laudable but general proposition that the California Constitution protects religious liberty even more strongly than the United States Constitution. It tells us nothing that could be of assistance to the state in this proceeding.

*Perry Educ. Ass'n v. Perry Local Educator's Ass'n.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). "Control over access to a non-public forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purposes served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451. We have applied the "reasonableness" test on a number of occasions. *E.g., Jacobsen v. Postal Serv.*, 993 F.2d 649, 657 (9th Cir.1992). The test requires more of a showing than does the traditional rational basis test; i.e., it is not the same as "establish[ing] that the regulation is rationally related to a legitimate governmental objective, as might be the case for the typical exercise of the government's police power." *Multimedia Pub. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir.1993); *see also Searcey v. Harris*, 888 F.2d 1314, 1322 (11th Cir.1989) (requiring evidence in the record to support determination that restriction is reasonable).

We conclude that it is not reasonable to allow employees to post materials around the office on all sorts of subjects, and forbid only the posting of religious information and materials. The challenged ban not only prevents employees from posting non-controversial information that might interest some or all employees—such as bulletins announcing the time and location of church services, invitations to children of employees to join a church youth group, and newspaper clippings praising Billy Graham, Mother Theresa or Cardinal Bernardin—it would also ban religious messages on controversial subjects such as abortion, abstinence of various types, family values, and the v-chip. Material that addresses controversial topics from a non-religious viewpoint would, however, be permissible, as would signs inviting employees to motorcycle rallies, swap meets, x-rated movies, beer busts, burlesque shows, massage parlors or meetings of the local militia.

The prohibition is unreasonable not only because it bans a vast amount of material without legitimate justification but also because its sole target is religious speech.

The state's strongest argument is that allowing the posting of religious material on the interior space of the building in question would give the appearance of government endorsement of religious messages. Such endorsement would, of course, be unconstitutional. *County of Allegheny v. ACLU*, 492 U.S. 573, 592–601, 109 S.Ct. 3086, 3100–05, 106 L.Ed.2d 472 (1989).[7] Even considering the government's greater interest in its wall-space, we find the rationale it offers for the order unpersuasive. Although the government states that "CDE's [California Department of Education's] facilities are public facilities," there is nothing in the record that would indicate that the public has access to or ever goes into the office areas where Tucker and the other employees of the Child Nutrition and Food Distribution Division do their work. Even if there were, the sweeping ban on the posting of all religious information would clearly be unreasonable. Reasonable persons are not likely to consider all of the information posted on bulletin boards or walls in government buildings to be government-sponsored or endorsed. Certainly a total ban on posting religious information of any kind is an unreasonable means of obviating such a concern. This case is different from *Monterey Cty. Democratic Central Comm. v. U.S. Postal Serv.*, 812 F.2d 1194 (9th Cir.1987), where we upheld a narrow ban on partisan political activity on the walkway area around a post office—an area we determined was a non-public forum, although it was widely used by the public. There, we had reason to be concerned that the public might believe that the government endorsed the particular activity sought to be carried on. Here, that is simply not the case.[8]

7. In *Capitol Square Review & Advisory Bd. v. Pinette*, — U.S. —, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), the endorsement test was supported, once again, by five of the justices. *See* Kathleen M. Sullivan, *Parades, Public Squares and Voucher Payments: Problems of Government Neutrality*, 28 Conn.L.Rev. 243, 253 (1996).

8. There is also nothing in the record to indicate that religious materials are more likely to disrupt harmony in the workplace than any other materials on potentially controversial topics such as same-sex marriage, labor relations, and even in some instances sports. Thus, this case is unlike *Cornelius* where there was evidence in the record—thousands of letters complaining about the

The government need not choose the least restrictive alternative when regulating speech in a nonpublic forum. *Swarner v. United States,* 937 F.2d 1478, 1482 (9th Cir. 1991). However, "its failure to select ... simple available alternative[s] suggests" that the ban it has enacted is not reasonable. *Multimedia Publishing,* 991 F.2d at 161. The state has simpler and far less restrictive alternatives available to it, such as setting up employee bulletin boards and limiting all employee postings to those sites, or permitting postings generally in the parts of the building not ordinarily visited by the public. Reasonable content-neutral restrictions on the space to be used and the duration of the posting would not be inconsistent with the first amendment. Any regulations would of course be subject to the principles governing content and viewpoint discrimination. The state might also, in a properly drawn order, ban the exhibition of religious symbols, artifacts or other similar items, which might reasonably convey an impression of state endorsement—or at least it might do so in areas outside of the employees' private office space. The constitutionality of any such order would depend of course on all of the circumstances involved in the particular case. Nevertheless, the availability of simple alternatives which infringe much less on the First Amendment rights of employees further supports our conclusion that the challenged order is unreasonable. *Id.*

Finally, although the line between content and viewpoint discrimination is a difficult one to draw,[9] we are also concerned that the order may constitute viewpoint discrimination because it has the effect of preventing not only messages that discuss religion generally, but also of silencing religious perspectives on controversial subjects in general. For example, as we have suggested above, the ban would appear to prevent a sign stating that "gay marriage is a sin," and quoting passages from the Bible to support that position. However, an employee could post a sign advocating a person's right to choose whatever mate he or she wishes, if he omitted any reference to biblical or other religious support for that position. While we hold the order unreasonable for other reasons, we note that Tucker has raised a colorable claim that it constitutes impermissible viewpoint based discrimination. *See, e.g., Lamb's Chapel v. Center Moriches Sch. Dist.,* 508 U.S. 384, 393, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352 (1993) (holding that "permit[ting] school property to be used for the presentation of all views about family issues and child-rearing except those dealing with the subject matter from a religious standpoint," was impermissible viewpoint discrimination.); *Cornelius,* 473 U.S. at 812, 105 S.Ct. at 3454 (viewpoint discrimination unreasonable even in a non-public forum).

We should note that there is a legitimate state interest in preventing displays of religious objects that might suggest state endorsement of religion. The state has a legitimate interest, for example, in preventing the posting of Crosses or Stars of David in the main hallways, by the elevators, or in the lobbies, and in other locations throughout its buildings. Such a symbol could give the impression of impermissible government support for religion. *See County of Allegheny v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). For the same reasons, the state may have a legitimate interest in regulating, or perhaps banning displays of religious artifacts and symbols in various parts of its office buildings. However, banning the posting of *all* religious materials and information in *all* areas of an office building except in employees' private cubicles simply goes too far. It is not a reasonable means of achieving the state's legitimate ends.

## OVERBREADTH

Tucker contends that the order banning religious advocacy and the order banning religious postings are overbroad.[10]

---

inclusion of advocacy groups in the fund drive—that supported the inference that the restriction in question would serve the government's legitimate concern about disruption in the workplace. 473 U.S. at 810–11, 105 S.Ct. at 3453–54.

9. *Compare Rosenberger v. Univ. of Virginia,* —— U.S. ——, —— – ——, 115 S.Ct. 2510, 2516–18, 132 L.Ed.2d 700 (1995) *with id.* at —— – ——, 115 S.Ct. at 2547–51 (Souter, J., dissenting).

10. Overbreadth challenges are a form of facial challenge that applies specifically to the First

We will not hold provisions facially overbroad where a suitable limiting construction is possible or where the overbreadth is not both "real, [and] substantial as well, judged in relation to the [provision's] plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 615, 93 S.Ct. 2908, 2916, 2917–18, 37 L.Ed.2d 830 (1973).

We will discuss each order in turn, briefly. In the case of the order banning religious advocacy, we conclude that the overbreadth is real and substantial. The order prevents free expression by employees, whenever they are in the workplace, even during lunch breaks, coffee breaks, and after-hours.[11] Moreover, the undefined term "religious advocacy" encompasses a wide range of speech, much of it permissible. We need not repeat the illustrations here.

The state has pointed to no narrowing construction of this order or of similar enactments by its courts or any state official. While we attempt to interpret state enactments to avoid constitutional problems, *e.g., Knapp v. Cardwell,* 667 F.2d 1253, 1260 (9th Cir.1982), *cert. denied,* 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982), we can discern no obvious interpretation of the order that will eliminate its overbreadth. We also see no way to sever the order or excise certain words from it in order to leave a legitimate portion in place, *see Brockett v. Spokane Arcades,* 472 U.S. 491, 504–05, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985), and it is not within the province of this court to "rewrite" the order to cure its substantial constitutional infirmities. *See Treasury Union,* —— U.S. at —— and n. 26, 115 S.Ct. at 1019 and n. 26; *Chapman v. United States,* 500 U.S. 453, 465, 111 S.Ct. 1919, 1927–28, 114 L.Ed.2d 524 (1991).

Our analysis as to the second order is similar; the order covers the posting on bulletin boards of a wide range of materials, from notices of church services to articles about all sorts of topics from a religious perspective. There appears to be no possible narrowing construction, and were we to attempt to sever the order in a manner that might minimize its constitutional deficiencies—so that, for example, it prohibited only the posting or display of religious artifacts—we would inevitably strip it of a substantial part of its purpose and effect. The state has not asked us to take any such step and we question whether it would be appropriate for us to do so. Here, unlike a case in which a statute is declared overbroad, the state can easily promulgate a new order that complies with the Constitution if it so wishes.

## CONCLUSION

Although we recognize that the state has a legitimate interest in avoiding the appearance of supporting religion and in furthering the efficiency of the workplace, the state interests here are insufficient to support the ban on religious advocacy, and the order prohibiting the posting of religious materials is clearly unreasonable. Moreover, both orders are overbroad. The order granting summary judgment for the defendant-appellees is reversed with directions to enter summary judgment for plaintiff-appellant and to afford such relief as may be appropriate.

**REVERSED AND REMANDED.**

---

Amendment. In First Amendment cases, unlike in other areas of the law, a party may challenge a statute or order on the ground that it is unconstitutional as applied to someone else, even if it could be constitutionally applied to the party before the court. *See generally* Richard H. Fallon, Jr., *Making Sense of Overbreadth,* 100 Yale L.J. 853, 859–60 (1991). In addition, a party whose speech may not be constitutionally prohibited may also challenge a statute as overbroad if the speech of others would be chilled. *Lind v. Grimmer,* 30 F.3d 1115, 1122 (9th Cir.1994), *cert. denied sub nom Wang v. Lind,* —— U.S. ——, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995). One of the

purposes of the doctrine is to prevent the "chilling" of the speech of others who are not before the court. *See Board of Airport Comm'rs. v. Jews for Jesus,* 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987).

**11.** The district court concluded that the order only prohibited religious advocacy during work hours. The order prohibits religious advocacy "during work hours *or* in the workplace." (emphasis added). We interpret this to mean that the ban applies at any time *in* the workplace.