**Marian SPRINGFIELD and Lynne McIntire, Plaintiffs,**

v.

**SAN DIEGO UNIFIED PORT DISTRICT, Defendant.**

**Civil No. 96–1669–BTM(CGA).**

United States District Court, S.D. California.

Dec. 20, 1996.

Peter D. Lepiscopo, Law Offices of Peter D. Lepiscopo, San Diego, CA, Benjamin W. Bull, American Center for Law and Justice, Scottsdale, AZ, for plaintiffs.

C. Michael Cowett, Best, Best & Krieger, LLP, San Diego, CA, for defendant.

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

MOSKOWITZ, District Judge.

### INTRODUCTION

This matter comes before the Court on Plaintiffs' motion for preliminary judgment. Based on the papers, oral argument held on December 20, 1996, and for the reasons stated below, Plaintiffs' motion is granted.

### BACKGROUND

The San Diego International Airport ("Airport") serves the sixth largest city in the United States. To meet increasing demands of the traveling public, Defendant San Diego Unified Port District ("Port District"), the government entity that operates, manages, and controls the Airport, began a $214 million reconstruction program at the Airport in May 1996. The Port District estimates that it will complete the reconstruction sometime in January 1998.

Until completion, the ongoing reconstruction will affect the regular operation of the Airport. For example, the Port District has at various times reduced the number of parking spaces at the Airport by 34 percent, closed certain entryways to the Airport's East and West Terminals, installed additional elevators, and built temporary support structures to accommodate those working on the reconstruction. The Port District also has engaged in a media campaign to discourage unnecessary Airport visits. Nonetheless, the Airport remains open to the public at large, and continues to house a variety of businesses, including restaurants, cafeterias, snack bars, coffee shops, cocktail lounges, clothing stores, bookstores, newsstands, postal machines, shoe shine stands, tourist information services, etc.

To address increased congestion, overcrowding, and safety concerns during reconstruction,[1] the Port District adopted Ordinance 1824, amending Article 5 of the San Diego Unified Port District Code (the "Ordinance"), in June 1996. The Ordinance prohibits groups, organizations and individuals from engaging in a series of "expressive activities" within the Airport terminals. Among other things, Airport visitors may not:

1. Conduct surveys or solicit information from the general public.

2. Conduct or participate in any speech making and/or proselytizing.

---

[1]. The Port District cites only one incident of actual disruption to Airport operations prior to the enactment of the Ordinance, and neither the Plaintiffs, their affiliates, nor anyone engaging in religious expressive activity were involved.

In April and May 1996, a self-proclaimed "U.S. Citizens Patrol" decided to police the Airport in search of illegal aliens. The private group stationed its members in ticket and gate areas, demanding to see the identification of those whom the group deemed suspicious. The Chicano Federation of San Diego staged a press conference in the East Terminal to protest the activities of the "Citizens Patrol." The organizations confronted each other, and chanting, shouting and clapping ensued. Because of the disruption this caused, the Port District sought and obtained a temporary restraining order and preliminary injunction against the two groups. *San Diego Unified Port District v. U.S. Citizens Patrol*, No. 700279 (S.D.Sup.Ct. July 31, 1996).

3. Conduct or participate in any parading, picketing, marching, patrolling, demonstrating and/or assembling.

4. Carry, display or cause to be displayed any signs or placards.

5. Distribute any literature, pamphlets or other printed material.

6. Seek petition signatures.

Ordinance § 5.15(b). The Ordinance allows individuals or groups to engage in these prohibited activities only in a handful of 10' × 14' "Authorized Solicitation/Free Speech" zones located outside the terminals, and only after obtaining a permit from the Port District.[2]

In addition to the restrictions on expressive activity, the Ordinance contains several general limitations on conduct at the Airport:

(e) No group, organization or person shall interfere with, impede or obstruct the work of airline or airport personnel.

(f) No group, organization or person shall interfere with, impede, or obstruct the movement or activities of the general public.

Ordinance §§ 5.15(e), (f).

The Ordinance makes it a misdemeanor to violate any of the above provisions. *Id.* § (g).

Plaintiffs describe themselves as "Christians" who, as "part of their religious faith share the Gospel of Jesus Christ with others." (Springfield Decl. ¶ 3; McIntire Decl. ¶ 3.) In the past, Plaintiffs have engaged in peaceful and nondisruptive religious expression in the Airport—including distributing pamphlets, wearing buttons or pins with religious messages, and promoting their faith in an attempt to win converts—without incident.

Plaintiffs have filed suit against the Port District seeking to enjoin enforcement of the Ordinance. Specifically, Plaintiffs challenge on First Amendment grounds the prohibitions on: (1) the distribution of "any literature, pamphlets or other printed materials," (2) "speech making and/or proselytizing," and (3) the carrying or displaying of "any signs

or placards." Plaintiffs have moved for a preliminary injunction.

## DISCUSSION

### I. Preliminary injunction standard

To obtain a preliminary injunction, Plaintiffs must show either "(1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in [the movant's] favor." *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 516 (9th Cir.1993) (quoting *Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir.1990)), *cert. dismissed sub nom. Peak Computer, Inc. v. MAI Systems Corp.*, 510 U.S. 1033 (1994). Plaintiffs have met this burden.

### II. Likelihood of success on the merits

The central issue in this case is the extent to which the government may regulate private speech on public property. As such, the matter is governed by the public forum doctrine, which seeks to balance the government's interest in maintaining its property with the public's interest in free expression. The public forum doctrine separates public property into three categories: first, "traditional" public fora—places which "by long tradition or by government fiat have been devoted to assembly and debate"; second, "limited" public fora—"public property which the State has opened for use by the public as a place for expressive activity"; and finally, "non-public" fora—property not dedicated to open communication. *See Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46 (1983). The Supreme Court has held that airport terminals are non-public fora. *See International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 683 (1992).

■ Speech regulations in a non-public forum such as the Airport will pass constitutional muster only if they are "reasonable in light of the purpose served by the forum and are viewpoint neutral." *Lamb's Chapel v.*

2. According to administrative procedures adopted pursuant to the Ordinance, the Port District issues permits on a first come, first served, content-neutral basis.

*Center Moriches Union Free School District,* 508 U.S. 384, 392–93 (1993) (quoting *Cornelius v. NAACP Legal Defense and Ed. Fund, Inc.,* 473 U.S. 788, 806 (1985)). As discussed below, the Ordinance prohibitions at issue fail this test.

Alternatively, the challenged provisions are also deficient under the First Amendment doctrines of vagueness and overbreadth. These are discussed below.

## A. Leafletting ban

This case is controlled largely by the Supreme Court's decision in *International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672 (1992).[3] In *ISKCON,* the Court considered the constitutionality of regulations prohibiting the "continuous or repetitive" solicitation of funds or the "sale or distribution of flyers, brochures, pamphlets, books or any other printed or written material" in airport terminals. *Id.* at 675–76. After determining that airport terminals are non-public fora, the Court upheld the solicitation ban as reasonable. *Id.* at 685.[4]

A majority of the Court also ruled, however, that the leafletting ban was constitutionally infirm. *Id.* at 830. In her concurring opinion,[5] Justice O'Connor reasoned that even under the deferential standard of review applicable to non-public fora, the leafletting ban was not sufficiently related to the airport's concerns about congestion and protecting travelers from unwanted intrusion. O'Connor explained:

> [W]e have expressly noted that leafletting does not entail the same kinds of problems presented by face-to-face solicitation. Specifically, "[o]ne need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand.... The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead the recipient is free to read the message at a later time.'" With the possible exception of avoiding litter, it is difficult to point to any problems intrinsic to the act of leafletting that would make it naturally incompatible with a large, multipurpose forum such as those at issue here.

*Id.* at 690 (citations omitted).

The Port District attempts to distinguish *ISKCON* by arguing that, in light of the recent reconstruction, the Airport is no longer a multipurpose forum. However, since the Airport continues to allow numerous restaurants, gift shops, cocktail lounges, novelty shops, news stands, tourist booths, car rental agencies, bus services, coffee shops, and other non-airport-related business, it remains a multipurpose forum for purposes of First Amendment analysis. *See id.* at 688 (O'Connor, J., concurring); *id.* at 693–704 (Kennedy, J., Blackmun, J., Stevens, J., Souter, J., concurring). This is not to say that the Airport is something more than a

---

3. The *ISKCON* case actually consists of two separate decisions: one, *ISKCON v. Lee,* 505 U.S. 672 (1992), upholding an airport ban on solicitations; and two, *Lee v. ISKCON,* 505 U.S. 830 (1992), invalidating an airport ban on leafletting. In addition, the Justices filed a variety of concurring and dissenting opinions on both issues. For the sake of simplicity, the two cases will be referred to collectively as *"ISKCON."* This reference should not be confused with *Heffron v. Int'l Soc'y for Krishna Consciousness,* 452 U.S. 640 (1981), or any other case involving ISKCON as a party.

4. The Court based its holding on a number of factors unique to face-to-face solicitation. The majority explained:

> Solicitation requires action by those who would respond: The individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card.

*ISKCON,* 505 U.S. at 683. In addition, the Court noted, "[t]he unsavory solicitor can also commit fraud through concealment of his affiliation or through deliberate efforts to shortchange those who agree to purchase." *Id.* at 684.

5. Five Justices voted to invalidate the leafletting ban. Four (Justices Kennedy, Blackmun, Stevens and Souter) considered airport terminals to be public fora, and subjected the regulations to the heightened scrutiny normally accorded such property. *ISKCON,* 505 U.S. at 703. Since Justice O'Connor provided the decisive fifth vote— and since she was part of the five-Justice majority that deemed airport terminals to be non-public fora—the Court finds her opinion to be the most instructive to the issues at bar.

non-public forum; indeed, *ISKCON* forecloses that conclusion. It does mean, though, that the Ordinance's speech regulation will not necessarily be deemed reasonable simply upon the Port District's assertion that a given restriction will mitigate congestion and assist in the reconstruction efforts. *See id.* at 689 (O'Connor, J., concurring) ("The reasonableness inquiry, therefore, is not whether the restrictions on speech are 'consistent with ... preserving the property' for air travel, but whether they are reasonably related to maintaining the multipurpose environment that the Port [District] has deliberately created.") (citation omitted)).

■ The Port District also suggests that its prohibition on pamphletting is reasonable because the designated permit zones outside the terminals provide adequate alternative avenues of communication. This ignores the ruling in *ISKCON,* which struck down a total ban on leafletting in airport terminals even though the regulations there permitted pamphletting in *all* sidewalk areas outside the terminal buildings. *Id.* at 672.[6] By contrast, the Ordinance here limits outside pamphlet distribution to a handful of 10′ × 14′ speech zones (which Plaintiffs claim are also designated smoking areas), and only upon the issuance of a permit. Of course, the Port District need not allow leafletting in all parts of the Airport terminals, *see id.* at 692 (O'Connor, J., concurring) (suggesting it might be permissible to restrict certain expressive activity "to a relatively uncongested part of the airport terminals"), but it cannot ban that activity completely from the terminals.

If anything, the Ordinance's leafletting ban is even less constitutionally acceptable than that in *ISKCON.* There, the regulation prohibited only "continuous or repetitive" leafletting, yet Justice Kennedy still remarked that that ordinance was "among the most restrictive possible." *Id.* at 703. Here, the Ordinance bans the distribution of *"any* literature, pamphlets or other printed materials," Ordinance § 5.15(b)(5) (emphasis added), presumably including the one-time handing-out of any printed items, however small or useful. Such sweeping language cannot withstand First Amendment scrutiny.

### B. Ban on "proselytizing" and "speech making"

■ The ban on "proselytizing" is similarly invalid under the public forum doctrine. The common understanding of the word "proselytize" incorporates some notion of religious advocacy.[7] In this light, the Ordinance singles out religious viewpoints for regulation, while simultaneously permitting free secular expression. As the Supreme Court has repeatedly reaffirmed in recent years, such unequal treatment of religious speech violates the First Amendment rights of private speakers even in a non-public forum. *See, e.g., Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 115 S.Ct. 2510, 2518, 2518 (1995) (holding that state university's refusal to fund religious newspaper, while continuing to fund secular publications, constituted viewpoint discrimination); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 394 (1993) ("[I]t discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child-rearing except those dealing with the subject matter from a religious standpoint.").

---

6. The Court noted that approximately 97% of air travelers used the sidewalk areas outside the terminals. *ISKCON,* 505 U.S. at 684.

7. Recent case law discussing "proselytizing" consistently refers to that term as a form of religious persuasion. *See, e.g., Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 115 S.Ct. 2510, 2539 (1995) (discussing "proselytizing" contained in newspaper with Christian editorial viewpoint); *Capitol Square Review Board v. Pinette,* 115 S.Ct. 2440, 2446 (1995) (noting how Supreme Court "has not excluded from free-speech protections religious proselytizing"); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 395 (1993) (discussing school district's denial of its property to a "radical" church "for the purpose of proselytizing"); *Employment Div., Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872, 877 (1990) (remarking how "the exercise of religion" often involves proselytizing); *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 606 (1989) (rejecting Justice Kennedy's "proselytization test" for Establishment Clause violations).

■ The Port District argues that "proselytizing" refers not just to religious advocacy but to all forms of persuasion. Interpreting the Ordinance language, the Port District relies on the Oxford English Dictionary, which defines the verb "proselyte" as "to cause, to come over or to turn from one opinion, belief, creed or party to another." While this definition saves the "proselytizing" ban from invalidation under *Rosenberger* and *Lamb's Chapel,* it renders the provision even more susceptible to First Amendment invalidation.

The ban on "speech making" is similarly sweeping, and will be treated together with the "proselytizing" prohibition.

The Port District attempts to move beyond the clear language of the Ordinance to narrow the definitions of both "speech making" and "proselytizing" in a constitutionally permissible way. As to the former, the Port District argues that "the Ordinance does not regulate speech but rather the act of giving 'a speech' or public address." (Def. Opposition Brf., at 19.) Regarding the term "proselytizing," Defendant contends that the ban "does not apply to informal discussions or conversations," but rather "only regulates when a group or an individual addresses the public generally and attempts to persuade them of some idea, doctrine, religion or whatever." (*Id.* at 20.)

Even accepting for the moment that the public at large will naturally understand the Ordinance to mean what the Port District now suggests, the ban on "speech making and/or proselytizing" still fails under public forum analysis. The Ordinance criminalizes any "public" address or attempt to persuade "the public" on any subject, including whether to buy Time Magazine instead of Newsweek, whether to root for the Pittsburgh Steelers over the San Diego Chargers, whether to fly on one airline rather than another, or, as the Port District puts it, "whatever." Surely, it is difficult to identify any "problems intrinsic to [these] act[s] that would make [them] naturally incompatible with a large, multipurpose forum such as [that] at issue here." *ISKCON,* 505 U.S. at 690 (O'Connor, J., concurring).

The Port District certainly has a strong interest in ensuring that the Airport functions smoothly and properly, especially during this period of reconstruction. In fact, the Ordinance contains numerous provisions that target the very congestion and passenger interference the Port District seeks to combat. In addition to banning solicitations in the terminals, the Ordinance states that:

(e) No group, organization or person shall interfere with, impede or obstruct the work of airline or airport personnel.

(f) No group, organization or person shall interfere with, impede, or obstruct the movement or activities of the general public.

Ordinance §§ 5.15(e), (f). Plaintiffs do not challenge these provisions, nor do they deny that violation of §§ 5.15(e) and (f) justifiably would subject their otherwise protected expression to criminal penalties. Since the above provisions necessarily cover any public speech or persuasive expression that interferes with, impedes, or obstructs the work or movement of others, the additional prohibitions on "speech making" and "proselytization" are "unreasonable ... because [they] ban a vast amount of material without legitimate justification...." *Tucker v. State of California Dep't of Educ.,* 97 F.3d 1204, 1214 (9th Cir.1996); *see also id.* at 1216 ("The government need not choose the least restrictive alternative when regulating speech in a nonpublic forum. However, 'its failure to select ... simple available alternative[s] suggests' that the ban it has enacted is not reasonable." (quoting *Swarner v. United States,* 937 F.2d 1478, 1482 (9th Cir.1991))).

■ Although the Plaintiffs have shown a probability of success on the merits under the public forum analysis explained above, it is worth mentioning briefly the additional problems raised by the void-for-vagueness doctrine. According to that doctrine, vague laws violate two fundamental principles of due process: (1) they leave the public guessing as to what actions are proscribed; and (2) they invite arbitrary and discriminatory enforcement by giving unbridled discretion to law enforcement officers. *See Grayned v. City of Rockford,* 408 U.S. 104, 108–09 (1972); *Connally v. General Const. Co.,* 269 U.S. 385,

391 (1926); *Finley v. National Endowment for the Arts*, 100 F.3d 671, 675 (9th Cir.1996). Vagueness is a particular problem where, as here, laws regulate expression. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) ("If ... the law interferes with the right of speech or of association, a more stringent vagueness test should apply."); *NAACP v. Button*, 371 U.S. 415, 433 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.... Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity").

Although the Port District now offers a limiting construction of its broadly-worded prohibitions,[8] this interpretation is unavailable to the casual Airport visitor. Simple reference to the Ordinance likely will leave Airport patrons with a number of unanswered questions. Does "proselytizing" refer only to religious advocacy? If it includes all subjects, how suggestive or persuasive may one be? Does "speech making" include any public expression? If not, how many people may a speaker address at one time without facing criminal prosecution? Three? Five? Ten? For how long can one permissibly speak to a large group before engaging in "speech making"? May a teacher give a "speech" to her class, telling them to behave as they await their flight? There is no clear answer to these questions, and thus the Ordinance fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned*, 408 U.S. at 108. This uncertainty chills Plaintiffs' constitutionally protected expression. *See id.* at 109 ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked.").

The Port District's limiting construction still leaves many crucial issues unresolved, necessarily vesting the Harbor Police with the authority to determine, for example, when a conversation transcends "interpersonal communication and informal discussion"[9] to become "speech making." Such unbridled discretion cannot survive constitutional scrutiny. *See, e.g., Board of Airport Comm'rs of City of Los Angeles v. Jews For Jesus*, 482 U.S. 569, 576 (1987) (noting that airport's "vague limiting construction" that speech prohibition be limited to "nonairport-related" expression gives airport officials "alone the power to decide in the first instance whether a given activity" subjects speaker to arrest).

Finally, the Court notes that without a proper narrowing construction, the ban on "speech making and/or proselytizing" raises serious overbreadth questions. Both terms "encompass[ ] a wide range of speech, much of it permissible." *Tucker*, 97 F.3d at 1217. Although the overbreadth doctrine is, "manifestly, strong medicine," *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973), the Supreme Court has stricken speech restrictions in airports where the regulations cannot "be limited by anything less than a series of adjudications, and the chilling effect of the [regulation] on protected speech in the meantime would make such a case-by-case adjudication intolerable." *Jews for Jesus*, 482 U.S. at 576.

### C. Sign/placard ban

■ Much of the discussion above applies with equal force to the prohibition on "[c]arry[ing], display[ing] or caus[ing] to be displayed any signs or placards." Ordinance § 5.15(b)(4).

Under public forum analysis, the ban—even if limited, as the Port District now suggests, to "the act of carrying or displaying signs which are unrelated to Airport

---

8. The Port District also cites to precatory language in the introduction to the Ordinance that states:

> That the District recognizes interpersonal communication and informal discussions between and among groups, organizations, and persons within the airport terminal facilities neither can nor should be prohibited.

Ordinance Introduction § 1(v). By the terms of the Ordinance, however, this provision states the Port District's legislative intent only, and did not become part of the San Diego Unified Port District Code.

9. *See supra* note 8.

business" (Def. Opposition Brf., at 21)—is not "reasonably related to maintaining the multi-purpose environment that the Port [District] has deliberately created." *ISKCON*, 505 U.S. at 689 (O'Connor, J., concurring). The regulation is not limited to large signs or to signs that obstruct pedestrian traffic or interfere with Airport employees' work; if it were, it would be redundant of §§ 5.15(f) and (g) of the Port District Code. Instead, the ban covers all signs, even those that have no effect on the Airport's congestion problems. Like the leafletting protected in *ISKCON*, the display of a small, unobtrusive sign "does not entail the same kinds of problems presented by face-to-face solicitation."[10] The sign prohibition, therefore, cannot survive even the deferential standards applied to non-public fora.

■ Alternatively, the sign prohibition is constitutionally infirm under vagueness and overbreadth analyses. When Plaintiff McIntire went to the Airport on August 20, 1996, confused about the scope the sign ban, she was told by Michael Farley, Operations Supervisor of the Airport, that she could not hold up an 8½″ × 11″ sign that reads "John 3:16," and could not wear a T-shirt with a religious message on it or a small button that states "Jesus Loves You" while simultaneously speaking to people about Jesus. (McIntire Decl. ¶¶ 23–25.) Such prohibitions surely violate the First Amendment. *See One World One Family Now v. City and County of Honolulu,* 76 F.3d 1009, 1015 (9th Cir.1996) ("A message on one's person or home has a unique effect because it 'provide[s] information about the identity of the speaker' [which is] an important component of many attempts to persuade." (quoting *City of Ladue v. Gilleo,* 114 S.Ct. 2038, 2046 (1994))). The Port District now suggests, though, that the Ordinance permits the wearing of printed buttons, pins and T-shirts, and bans only the display of signs "unrelated to airport business." (Galligan Decl. ¶¶ 11–12) The Ordinance on its face, however, contains no such limitation, and bans the display of *all* signs.

Even accepting the Port District's limiting construction, the Ordinance remains hope-lessly vague. As the Supreme Court has explained in a related case concerning a ban on "First Amendment activities" within airport terminals, "[s]uch a limiting construction . . . is of little assistance in substantially reducing the overbreadth of the [Ordinance]. Much nondisruptive speech . . . may not be 'airport related,' but is still protected speech even in a nonpublic forum." *Jews for Jesus,* 505 U.S. at 576. "Moreover," the Court continued, "the vagueness of this suggested construction itself presents serious constitutional difficulty. The line between airport-related speech and nonairport-related speech is, at best murky." *Id.* This murkiness infects the Port District's proposed limiting construction, and therefore the Plaintiffs have established a likelihood of success on the merits on vagueness and overbreadth grounds, as well.

### III. Irreparable injury

■ Plaintiffs maintain that the Ordinance violates their rights to engage in constitutionally protected expression at the Airport. Since "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States,* 403 U.S. 713 (1971)), Plaintiffs have satisfied this second prong of the preliminary injunction test. *See also, e.g., Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1528 (9th Cir.1993) ("[A]ny loss of First Amendment freedoms, even briefly, can constitute irreparable injury." (quoting *Lydo Enterprises, Inc. v. City of Las Vegas,* 745 F.2d 1211, 1214 (9th Cir.1984))).

### CONCLUSION AND ORDER

Because Plaintiffs have shown both a likelihood of success on the merits and the possibility of irreparable injury, Plaintiffs' motion is GRANTED, and Defendant and its officers, employees, and agents are preliminarily enjoined and restrained from enforcing §§ 5.15(b)(2), (4), and (5) of the San Diego Unified Port District Code prohibiting groups, organizations or persons from engag-

---

10.  *See supra* note 4.

ing in the following activities in the San Diego International Airport:

(1) Conducting or participating in any "speech making and/or proselytizing."

(2) Carrying, displaying or causing to be displayed "any signs or placards."

(3) Distributing "any literature, pamphlets or other printed material."

IT IS SO ORDERED.