Brenda NICHOL, Plaintiff,

v.

ARIN INTERMEDIATE UNIT 28; Robert H. Coad, Jr., Executive Director, Arin Intermediate Unit 28, in his personal and official capacities, John T. Smith, Jr., Director of Special Education, Arin Intermediate Unit 28, in his personal and official capacities, Robert T. Truscello, Supervisor, Arin Intermediate Unit 28, in his personal and official capacities, Defendants.

No. 03–CV–646.

United States District Court,
W.D. Pennsylvania.

June 25, 2003.

540

Joseph L. Luciana, Kirkpatrick & Lockhart, Pittsburgh, PA, Kristina J. Wenberg, Vincent P. McCarthy, American Center for Law & Justice, New Milford, CT, for Plaintiff.

Richard B. Tucker, III, Gary J. Gushard, Tucker Arensberg, Anthony G. Sanchez, Pittsburgh, PA, for Defendants.

## MEMORANDUM OPINION

SCHWAB, District Judge.

### I. Introduction

The "Garb Statute," a provision of the Pennsylvania School Code, prohibits teachers and certain other Pennsylvania public school professional employees from wearing religious dress, marks, garb, emblems or insignia while performing their duties in public schools. 24 Pa. Stat. Ann. § 11–1112, Act of March 10, 1949, P.L. 30, art. XI, § 1112. The "Religious Affiliations" policy adopted by defendant ARIN Intermediate Unit 28 ("ARIN") prohibits all of its employees from wearing "religious emblems, dress, or insignia" in schools under ARIN's authority, specifically including re-

ligious jewelry such as "crosses and Stars of David" as examples of prohibited religious apparel or accessories.

On April 8, 2003, Brenda Nichol was suspended pursuant to the Garb Statute and ARIN's Religious Affiliations policy from her job as an instructional assistant at the Penns Manor Area Elementary School ("Penns Manor"), a school within Intermediate Unit 28, for refusing to comply with her supervisor's request that she remove or conceal a small cross she regularly wore on a necklace.

Because this Court finds that ARIN's Religious Affiliations policy violates the Free Exercise of Religion and Free Speech Clauses of the First Amendment to the United States Constitution, that Ms. Nichol will suffer irreparable injury in the event the Court does not grant her request for injunctive relief, and that the balance of equities (i.e., the harm to plaintiff if the Court does not grant a preliminary injunction versus any harm to other parties and to the public if such relief is granted) weighs in her favor, the Court finds the ARIN's Religious Affiliations policy unconstitutional, and will direct defendants to reinstate Ms. Nichol to her former position pending disposition of plaintiff's request for a permanent injunction.

### II. Procedural History

On May 6, 2003, plaintiff filed a complaint for injunctive and declaratory relief, and a motion for a preliminary injunction, with Ms. Nichol's affidavit attached, requesting this Court, inter alia, to declare the Garb Statute and the Religious Affiliations policy unconstitutional under the Free Speech and Free Exercise of Religion Clauses of the First Amendment, enjoin the enforcement of the statute and policy, and reinstate her to her former position as instructional assistant.

On May 8, 2003, the parties filed a joint stipulation of facts (Document No. 9), and defendants filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (Document No. 10) for failure to state a claim, along with a response and brief in opposition to preliminary injunction, with affidavits by individual defendants Robert H. Coad, Jr., ARIN's Executive Director, and Robert T. Truscello, Supervisor for ARIN.

The Court heard oral argument on May 9, 2003, and thereafter scheduled an evidentiary hearing and directed the parties to present evidence on the three factual matters in dispute: the size of plaintiff's cross; the frequency and length of time she had worn the cross and whether she wore it visibly; and Mr. Truscello's knowledge or awareness that plaintiff wore a cross to work at Penns Manor (i.e., what did he observe and when did he observe it). The evidentiary hearing was conducted on May 12, 2003. Pursuant to this Court's order, the parties have filed supplemental briefs and supplemental joint stipulations of facts not in dispute.

### III. Stipulation of Undisputed Facts

The facts and circumstances giving rise to plaintiff's First Amendment claims have mostly been stipulated by the parties, as set forth below.

### A. The Parties

1. Plaintiff, Brenda Nichol, is an adult citizen of the United States who resides at 427, Donahey Road, Glen Campbell, Pennsylvania 15742.

2. In April 2003, Ms. Nichol was employed by ARIN Intermediate Unit 28 ("ARIN") as an instructional assistant at Penns Manor Area Elementary School.

3. Defendant, ARIN, is a political and governmental subdivision of the Commonwealth of Pennsylvania. ARIN is located at 2895 W. Pike, Indiana, Pennsylvania 15701–9769. ARIN receives federal, state, and local school district funding. ARIN is governed by a Board of Directors, composed of one school board member from each public school district in Armstrong and Indiana Counties.

4. ARIN is a part of the governance structure of public education in the Commonwealth. ARIN is charged with providing services to Armstrong and Indiana County school districts, and providing educational support for the students of those counties. ARIN provides the counties' schools with educational technology, professional/staff development, curriculum services, school-age programs, preschool education, adult education, cooperative projects, and statewide initiatives.

5. Defendant, Robert H. Coad, Jr., Ed. D., is the Executive Director of ARIN Intermediate Unit 28.

6. Defendant John T. Smith, Jr., Ph.D., is the Director of Special Education of ARIN Intermediate Unit 28.

7. Defendant Robert T. Truscello is a Supervisor of Special Education of ARIN Intermediate Unit 28.

### B. Background

8. Ms. Nichol's employment with ARIN began as a substitute for one year in 1995; she was later hired by ARIN Intermediate Unit 28, full-time, beginning in the Fall school year of 1996.

9. During 1995, Ms. Nichol was placed in Marion Center High School, but during the period beginning in the Fall 1996 school year and ending in the Spring of 2002, she began work in Marion Center Middle School.

10. From the Fall of 2002 until April 8, 2003, Ms. Nichol worked in Penns Manor Area Elementary School, located at 6003 Rt. 553 Hwy., Clymer, Pennsylvania 15728.

Ms. Nichol's supervisor is Robert Truscello.

11. As an instructional assistant in an emotional support classroom, Ms. Nichol's duties include assisting students in mainstream classroom activities, monitoring and recording behavior of those students, and implementing the behavior and educational plan for those students. At the time relevant to this lawsuit, she spent most of her time with one particular fourth grade student who is considered emotionally disabled and who has difficulties especially with transitions. However, there are other fourth, fifth and sixth grade students in the classroom.

12. In 1997, Ms. Nichol received a notice with her paycheck, dated October 16, 1997 and addressed to Intermediate Unit Staff, that explained the "Pennsylvania Public School Code (24 Pa. Stat. Ann. § 11–1112)" did not allow `wearing religious jewelry, giving "Crosses or Stars of David" as examples. The notice included an explanation of consequences-a one-year suspension, and a permanent suspension in the event of a second infraction.

## C. The Suspension

13. On March 11, 2003, Mr. Truscello approached the teacher in Ms. Nichol's classroom, as well as Ms. Nichol and other co-workers of Ms. Nichol, reminding them to comply with the Pennsylvania School Code that prohibits wearing any religious symbol, or not to display any religious symbol openly if they chose to wear one, while at work. He explained that this prohibition included a cross or any other religious symbol. They were asked either not to wear their crosses or to tuck them in.

14. The Policy that restricts plaintiff Nichol's ability to openly display her cross necklace was promulgated under the authority of, and is controlled by, ARIN, which cites to the Pennsylvania School Code, 24 Pa. Stat. Ann. § 11–1112 as its authority. [Exhibit "A" to the Joint Stipulation of Facts is a copy of the ARIN Policy.]

15. On April 4, 2003, Mr. Truscello approached Ms. Nichol regarding the matter, and Ms. Nichol explained to him that she believed that his request was like asking her to remove or hide her wedding rings. Ms. Nichol also explained that the cross was a symbol of freedom for her, and that she could not deny Christ in such a way as she was being asked to do. Mr. Truscello responded to Ms. Nichol's explanation by saying that he was not buying the wedding ring rationale, and that Ms. Nichol's religion is in her heart, not in what she wears.

16. Later in the day on April 4, 2003, Mr. Truscello returned to Ms. Nichol's classroom, specifically to give Ms. Nichol a copy of the ARIN Intermediate Unit 28 handbook, and he cited to it, explaining that she could not wear her cross. Mr. Truscello again asked Ms. Nichol to tuck in her cross, and he gave her until April 8, 2003 to decide whether she would comply. He warned that if Ms. Nichol wore her cross on April 8, 2003, he would suspend her for one year, as the Pennsylvania School Code required.

17. On April 8, 2003, Ms. Nichol visibly wore her cross to work and was suspended.

18. Ms. Nichol later received an official letter of suspension, dated April 8, 2003, from John T. Smith, Jr. notifying her that she was suspended from employment as of April 7, 2003, with pay, until further notice. *See* Exhibit "B" to the Joint Stipulation of Facts.

19. The following week, Ms. Nichol received a second notice from Robert H. Coad, Jr., dated April 16, 2003, which supplemented the letter of April 8, 2003. That notice further suspended Ms. Nichol

without pay as of April 19, 2003, but allowed her to keep her health, dental, vision, and life insurance benefits. *See* Exhibit "C" to the Joint Stipulation of Facts.

20. On May 9, 2003, the parties filed a supplement to their joint stipulation of facts, which provides that Ms. Nichol does not have a teaching or other professional certificate from the Pennsylvania State Board of Education or from ARIN.

21. Following the evidentiary hearing, the parties filed a second supplemental stipulation accompanied by Plaintiff's Exhibit 3, which is an actual sized photograph of the cross alongside a ruler taken in natural lighting. The cross has white stones embedded on it and no other symbols or figures. Exhibit 3 supports the parties' oral ·stipulation that Ms. Nichol's cross is 1 & 7/16 inches in height and 15/16 inches in width.

### IV. Additional Fact Findings and Credibility Determinations by the Court

22. Ms. Nichol testified, inter alia, that her mother gave her the cross as a gift after her mother's stroke in 1996, and she began wearing the cross to school shortly after that; plaintiff wore the cross on average three times a week in the classroom and throughout the school, and in the presence of the teacher she worked with, Debbie Dudt, who saw her wearing the cross; other employees at Penns Manor saw her wear the cross at work; plaintiff never tucked in the cross when she wore it; no one said anything to her about the cross until March 20, 2003, when Ms. Dudt reminded her of Mr. Truscello's request that her cross be tucked in, and then on April 4, 2003, when Mr. Truscello approached her about it; plaintiff had received a memo or notice about the religious dress policy in 1997 but she continued to wear her cross, as other school district employees were wearing similar jewelry. Ms. Nichol also stated the following reason she wore her cross and refused to take it off upon request: "I believe in Jesus Christ as my Lord and Savior. And I believe that this would be denying him in a sense of tucking this cross in because I am not ashamed of my Lord and Savior Jesus. I will do nothing to deny my faith and belief in him." Transcript, Evidentiary Hearing, May 12, 2003, at 17.

The Court finds that Ms. Nichol's testimony is credible, and accepts her testimony as truthful.

23. Mr. Truscello testified, inter alia, that he has been plaintiff's supervisor since she began with ARIN; that he saw plaintiff intermittently about 1 or 2 times a week since 1996, but the ·duration and nature of his weekly interactions with plaintiff would vary greatly, ·from formal meetings and formal classroom observations, to short and informal classroom observations and brief hallway encounters; that he did not observe plaintiff wearing her cross until April 4, 2003, but that he "would be very sensitive" to wearing of crosses by employees he supervised; that pins such as his "DAD" pin could be and were worn at school so .long as they did not have religious symbolism; that he learned on March 10, 2003, that someone had informed a teacher's union representative that one of the instructional assistants was wearing a cross; that on March 11th or 18th, he spoke with Ms. Nichol and other staff employees of ARIN and reminded them of its policy as set forth in ARIN's handbook, and at that meeting she definitely was not wearing her cross; and that Ms. Nichol had very positive relationships with the emotionally challenged fourth grade student and Ms. Dudt, the student and teacher with whom she most often worked, and Ms. Nichol had been "very successful" helping her student with his transition into mainstream classes.

The Court finds that Mr. Truscello's testimony is credible, and accepts his testimony as truthful.

24. As counsel for ARIN acknowledged at oral argument, plaintiff's and Truscello's affidavits as to the duration, frequency and visibility of the cross wearing are not necessarily inconsistent, nor is their testimony at the evidentiary hearing. The Court finds Mr. Truscello's and Ms. Nichol's testimony and affidavits are, in fact, compatible as to how often and how visibly Ms. Nichol wore her cross to work.

25. Crediting plaintiff's testimony, the Court finds she wore her cross on her necklace, outside of her clothing, since 1996, on the average of three times a week.

26. Crediting Mr. Truscello's testimony, the Court finds he did not observe plaintiff wearing her cross until April 4, 2003, although he would see her once or twice a week for various lengths of time (from minutes to hours) depending on his degree of interaction and observation. The Court credits his testimony that on March 11th or 18th, Ms. Nichol did not wear her cross.

27. Plaintiff wore her cross frequently and visibly in Mr. Truscello's presence for over six years, without him noticing it, and the Court observed Ms. Nichol wearing the cross in court in the manner she usually wore it at work. The Court finds that plaintiff's cross is unobtrusive.

28. There was no evidence introduced or offered that plaintiff's cross wearing caused any disturbances or disruptions to classes or school activities, or any harm to the school environment.

29. There was no evidence introduced or offered that plaintiff's cross wearing caused any dissension, problems or controversy between her and Ms. Dudt or any other teacher or employee with ARIN or Penns Manor.

30. There was no evidence introduced or offered that plaintiff's cross wearing caused any dissension, problems or controversy between her and the student she primarily worked with, or with any other student.

31. To the contrary, Ms. Nichol and Mr. Truscello both testified as to the close and very successful relationship plaintiff had with the fourth grade boy she was primarily assisting with his emotional problems, especially with transition issues, and that this student has almost made a complete transition to the mainstream, with her valuable assistance.

32. There was no evidence introduced or offered that any student, parent, teacher, supervisor or other employee of ARIN or Penns Manor complained about plaintiff's cross.

33. There was no evidence introduced or offered that plaintiff proselytized, preached or taught her religious beliefs to students, faculty or others while at school.

34. Mr. Truscello testified that on March 27, 2003, Dr. Smith informed him that he had received a report from someone in the teachers union that one of the instructional assistants Mr. Truscello supervised had been observed wearing a cross on her necklace while at work.

35. ARIN permits the wearing of decorative jewelry with no religious symbolism by teachers and employees under its authority if it has no message or the message is secular. In fact, Mr. Truscello wore a lapel pin to court on May 12, 2003, which he sometimes wears to school, which consists of the word "DAD."

36. Since plaintiff's suspension, a substitute instructional assistant has been hired, at the ultimate expense of ARIN

and taxpayers, to work with the student plaintiff had been assisting so successfully.

37. ARIN has informed the Court that it will continue to pay plaintiff her salary and benefits through the remainder of the school year, and any back wages owed, regardless of the Court's ruling on the motion for preliminary injunction.

## V. Statutory and Regulatory Framework

The Pennsylvania School Code's Garb Statute provides as follows:

> Religious garb, insignia, etc., prohibited; penalty
>
> (a) That no teacher in any public school shall wear in said school or while engaged in the performance of his duty as such teacher any dress, mark, emblem or insignia indicating the fact that such teacher is a member or adherent of any religious order, sect or denomination.
>
> (b) Any teacher employed in any of the public schools of this Commonwealth, who violates the provisions of this section, shall be suspended from employment in such school for the term of one year, and in case of a second offense by the same teacher he shall be permanently disqualified from teaching in said school. Any public school director who after notice of any such violation fails to comply with the provisions of this section shall be guilty of a misdemeanor, and upon conviction of the first offense, shall be sentenced to pay a fine not exceeding one hundred dollars ($100), and on conviction of a second offense, the offending school director shall be sentenced to pay a fine not exceeding one hundred dollars ($100) and shall be deprived of his office as a public school director. A person thus twice convicted shall not be eligible to appointment or election as a director of any public school in this Commonwealth within a period of five (5) years from the date of his second conviction.

24 Pa. Stat. Ann. § 11–1112.

The Pennsylvania School Code defines "teacher" in a separate provision as follows:

> "Teacher" shall include all professional employees and temporary professional employees, who devote fifty per centum (50%) of their time, or more, to teaching or other direct educational activities, such as class room teachers, demonstration teachers, museum teachers, counsellors, librarians, school nurses, dental hygienists, home and school visitors, and other similar professional employes and temporary professional employes, *certificated in accordance with the qualifications established by the State Board of Education.*

24 Pa. Stat. Ann. § 11–1141 (emphasis added).

ARIN implemented the Garb Statute by adopting its Religious Affiliations policy, set forth in its employee handbook. That policy states that, pursuant to the Pennsylvania Public School Code, "employees shall not display any religious emblems, dress, or insignia. This includes jewelry such as crosses or Stars of David." Joint Stipulation, Exhibit A. The handbook also sets forth the penalty for violation of the School Code as one year suspension for the first violation, and "permanent suspension" for a second. *Id.*

Additionally, ARIN's employee handbook sets out its "Nondiscrimination Policy," which states that ARIN is an equal opportunity employer that does not discriminate on the basis of "race, color, national origin, sex, handicap or age ..." Joint Stipulation, Exhibit A. The Nondiscrimination Policy, however, does not include "religious beliefs" or "religion"

among the prohibited bases of discrimination.

## VI. Preliminary Injunction Standards

█ A plaintiff must demonstrate four elements in order to obtain a preliminary injunction: (1) plaintiff is reasonably likely to prevail eventually in the litigation; (2) plaintiff is likely to suffer irreparable injury without relief; if these first two threshold showings are made, the Court must then consider, to the extent relevant, (3) whether an injunction would harm the defendant more than denying relief would harm the plaintiff; and (4) whether granting relief would serve the public interest. *ACLU v. Ashcroft*, 322 F.3d 240, 250 (3d Cir.2003); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir.2002).

## VII. Likelihood of Success

### A. Pennsylvania Garb Statute

█ Preliminarily, the Court concludes that the Pennsylvania Garb Statute does not apply to plaintiff who, although she probably devotes 50% or more of her time at teaching and educational activities, is not one of the enumerated professional employees designated by section 11–1141 of the School Code, 24 Pa. Stat. Ann. § 11–1141, nor has she been "certificated in accordance with the qualifications established by the State Board of Education." Defendants argue that "common sense" dictates that this statute should apply to instructional assistants and any other employees of ARIN who stand in front of the students presenting him or herself as a member of this or that religion by their religious garb or insignia.

█ Whether or not defendants' "common sense" interpretation is correct, Pennsylvania's Statutory Construction Act of 1972, 1 Pa.C.S. § 1901–1991, as amended, provides that "words and phrases shall be construed according to rules of grammar and according to their common and approved usage;" that the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of Pennsylvania's General Assembly, giving effect, if possible, to every provision of a statute; and that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1903 and § 1921(a) and (b), respectively. Only if the words of the statute are not clear and free from all doubt may a court resort to extraneous matters to ascertain the intention of the General Assembly, *In re Barshak*, 106 F.3d 501 (3d Cir.1997); *Ramich v. W.C.A.B. (Schatz Elec., Inc.)*, 564 Pa.656, 770 A.2d 318 (2001), and *only then* would defendants' resort to "common sense" be material.

The words of the Pennsylvania School Code defining "teacher" are clear and free from all doubt—a teacher is one of the enumerated or non enumerated professional and temporary professional employees who devote 50% or more of their time to teaching or direct educational activities, *and who are "certificated in accordance with the qualifications established by the State Board of Education."* 24 Pa. Stat. Ann. § 11–1141. It is undisputed that plaintiff does not have a teaching or other certificate from the Pennsylvania Board of Education or from ARIN, and therefore the provisions of the Pennsylvania School Code applicable to "teachers," such as the Garb Statute, are not applicable to her. Thus, plaintiff cannot be disciplined pursuant to that statute for wearing a religious emblem or insignia, nor can her employer or supervisors.

Nevertheless, defendants suspended plaintiff pursuant to ARIN's Religious Affiliations policy, which references and was

adopted to implement the Garb Statute, and that policy must be measured against the constitutional protections afforded by the First Amendment.

## B. The First Amendment

 Plaintiff is likely to succeed on the merits of her First Amendment claims. The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. 1. The First Amendment applies to the states and its political subdivisions through the Fourteenth Amendment. *Zelman v. Simmons–Harris*, 536 U.S. 639, 648–49, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (Ohio's tuition aid to certain students in Cleveland, including those attending schools with religious affiliations, does not violate First Amendment's Establishment Clause). Plaintiff's complaint implicates the first three clauses of the First Amendment: the Establishment Clause, the Free Exercise Clause and the Free Speech Clause, among other claims.

Initially, the Court observes that government rules and regulations which impact freedom of speech often will also implicate the Establishment and Free Exercise Clauses of the First Amendment. As the United States Court of Appeals for the Third Circuit remarked in *ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471 (3d Cir.1996):

> The First Amendment protects speech and religion by quite different mechanisms. Speech is protected by insuring its full expression.... The method for protecting freedom of worship and freedom of conscience in religious matters is quite the reverse.... The Free Exercise Clause embraces a freedom of conscience and worship that has close parallels in the speech provisions of the First Amendment, but the Establishment Clause is a specific prohibition on forms of state intervention in religious affairs with no precise counterpart in the speech provisions.

*Black Horse Pike*, 84 F.3d at 1478 (internal citations omitted), *quoting Lee v. Weisman*, 505 U.S. 577, 591, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

The development of the law with regard to the Religion Clauses in the decisions of the Supreme Court of the United States illustrates the conflict inherent in the First Amendment, which requires governments to walk a sometimes fine line between laws "establishing" or "endorsing" religion, and laws averse or hostile to religion. It is not necessary to draw too fine a line in this case, however. ARIN's Religious Affiliations policy is openly and overtly averse to religion because it singles out and punishes *only* symbolic speech by its employees having religious content or viewpoint, while permitting its employees to wear jewelry containing secular messages or no messages at all.

ARIN's Religious Affiliations policy thus displays, in purpose and effect, decided hostility toward religion, without any important or compelling state interests served, and violates the Free Exercise Clause of the First Amendment. This policy is also a content driven regulation which violates plaintiff's right to free (symbolic or expressive) speech on a matter of public concern, even though, as a public employee, her speech may be somewhat more regulated by her public employer than that of a private citizen.

## C. Free Exercise and Establishment Clauses

### 1. Neutrality

 Government neutrality toward religion is the hallmark of the Religion

Clauses. *Black Horse Pike*, 84 F.3d at 1488, *citing Bd. of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 696, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) ("A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of neutrality toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents.") (internal quotations and citation omitted). The neutrality principle, synthesized from the Free Speech, Free Exercise and Establishment Clauses of the First Amendment, respects the "crucial distinction between 'government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.'" *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 841, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), *quoting Bd. of Educ. of Westside Community Schools v. Mergens By and Through Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (opinion of O'Connor, J.). Most recently, the Supreme Court reaffirmed the neutrality principle in the context of government tuition aid to students attending both public schools and private schools with religious affiliations, stating that "where a government aid program is neutral with respect to religion ... the program is not readily susceptible to challenge under the Establishment Clause." *Zelman*, 536 U.S. at 652, 122 S.Ct. 2460.

### 2. *Lemon* Test–The Entanglement Inquiry

■ Since 1971, the *Lemon* test (*Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)) has provided the measure of whether a government practice offends the Establishment Clause—it does not offend if (1) it has a secular purpose, (2) its principal or primary effect neither advances nor inhibits the free exercise of religion, and (3) it does not create excessive entanglement of the government with religion.

### 3. Modified *Lemon* Test–The Endorsement Inquiry

■ Despite some debate about the continuing validity of the three-prong *Lemon* test over the last decade and a half, a majority of the Supreme Court has modified the test by folding the last two prongs into one "effects" inquiry. *Zelman*, 536 U.S. at 648–49, 122 S.Ct. 2460, *citing Agostini v. Felton*, 521 U.S. 203, 222–23, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *L.M. v. Evesham Twsp. Bd. of Educ.*, 256 F.Supp.2d 290, 302–03 (D.N.J.2003), *quoting* Justice O'Connor's concurring opinion in *Zelman*, 536 U.S. at 668, 122 S.Ct. 2460. Under the current formulation, the Establishment Clause essentially prevents a government from enacting laws that have the purpose or effect of advancing or inhibiting religion. *Zelman*, 536 U.S. at 648–49, 122 S.Ct. 2460 (Rehnquist, C.J., for the Court), and 536 U.S. at 668–69, 122 S.Ct. 2460 (O'Connor, J., concurring) ("In *Agostini* ... 521 U.S. 203, 218, 232–233[, 117 S.Ct. 1997] ..., we folded the entanglement inquiry into the primary effect inquiry. This made sense because both inquiries rely on the same evidence, ... and the degree of entanglement has implications for whether a statute advances or inhibits religion....").

In *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), the Court applied the *Lemon* test to decide that a New York City program allowing parochial school teachers into public schools for remedial education violated the Establishment Clause as an excessive entanglement. *Agostini*, decided in 1997, explained that First Amendment and Establishment Clause law had "significantly

changed" in the intervening years, 521 U.S. at 237, 117 S.Ct. 1997, stating:

> To be sure, the general principles we use to evaluate whether government aid violates the Establishment Clause have not changed since *Aguilar* was decided. For example, we continue to ask whether the government acted with the purpose of advancing or inhibiting religion, and the nature of that inquiry has remained largely unchanged.... Likewise, we continue to explore whether the aid has the "effect" of advancing or inhibiting religion. What has changed since ... [1985] is our understanding of the criteria used to assess whether aid to religion has an impermissible effect.

521 U.S. at 222–23, 117 S.Ct. 1997 (citations omitted).

■ The major change in the *Lemon* "effect" inquiry is the shift from the focus on government "entanglements" to Justice O'Connor's "endorsement" inquiry. The endorsement inquiry asks whether a "reasonable observer" who is deemed aware of the history and context of a challenged policy or program would consider the government policy or program to be an endorsement of religion, which would violate the Establishment Clause, or simply an accommodation of religious beliefs or practices in the interests of individuals' rights to freely practice or express their religion, which does not. *Zelman*, 536 U.S. at 652–55, 122 S.Ct. 2460; *Tenafly*, 309 F.3d at 174–75 (collecting cases).

### 4. Heightened Scrutiny

· ■ ARIN's Religious Affiliations policy must be tested under heightened, but not quite strict, scrutiny. *Tenafly*, 309 F.3d at 166 n. 27; *FOP v. City of Newark*, 170 F.3d 359, 365–66 (3d Cir.1999). The Religious Affiliations policy prohibiting the wearing of *religious* dress, emblems and insignia, specifically including crosses and

stars of David, is directed *only* at religious exercise and symbolic expression, and thus is content and viewpoint based. *Good News Club v. Milford Central School*, 533 U.S. 98, 107–110, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) ("speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint. Thus, we conclude that Milford's exclusion of the [Good News] Club from use of the school, pursuant to its community use policy, constitutes impermissible viewpoint discrimination."), *reaffirming, inter alia, Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).

■ Content or viewpoint based restrictions on Free Exercise and Free Speech are ordinarily subject to the strictest of scrutiny. *Id.; Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 884, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). However, the public employment context adds another wrinkle to the analysis of ARIN's policy.

■ Public employers enjoy somewhat more leeway, but not carte blanch, in regulating the speech and other First Amendment activities of their employees. "Heightened" or "intermediate" level scrutiny generally applies in the public sector, "under which the challenged government action must be substantially related (rather than narrowly tailored) to promoting an important (rather than compelling) government interest ... because First Amendment rights are limited in the public employment context by a government's need to function efficiently." *Tenafly*, 309 F.3d at 167 n. 27, *explaining City of Newark*.

In *City of Newark*, the United States Court of Appeals for the Third Circuit

struck down a police department regulation which prohibited its uniformed officers from wearing beards and other facial hair, but allowed exemptions for some purposes, such as medical conditions. Two Sunni Muslim police officers, who followed the obligation of their religion to grow beards and faced disciplinary proceedings because of it, challenged the no-beards policy as interfering with their First Amendment rights of Free Exercise and Free Speech. The officers argued that, because the department permitted exemptions for secular reasons but not to accommodate the exercise of their religion and their symbolic expression of their religion, it was not neutral toward religion, but rather discriminated against free expression and exercise of religion. The Court of Appeals agreed that the police department's regulation violated the Free Exercise Clause (and did not reach the Free Speech claim), stating:

> ... [T]he Court's concern [in *Smith* and *Lukumi*] was the prospect of the government's deciding that secular motivations are more important than religious motivations. If anything, this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a *categorical exemption* for individuals with a secular objection *but not for individuals with a religious objection. See generally Lukumi*, 508 U.S. at 542[, 113 S.Ct. 2217] (1993) ("All laws are selective to some extent, but *categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice.*") (emphasis added). Therefore, we conclude that the Department's decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under *Smith* and *Lukumi*.

*City of Newark,* 170 F.3d at 365 (emphasis added; parallel citation omitted).

Applying the heightened standard, the United States Court of Appeals for the Third Circuit found that the police department's decision to exempt beards worn for medical reasons, but not for religious reasons, amounted to discrimination because the government made a categorical value judgment in favor of secular exemptions and hostile to religious exemptions. *Id.* at 366–67. The department could not offer any important reasons for its discrimination against the free exercise of religion, and its no beards policy did not, therefore, survive the Court's heightened scrutiny. The neutrality principle applied in *City of Newark* in the public employment context was summarized by the Court of Appeals for the Third Circuit in *Tenafly,* as follows: "government cannot discriminate between religiously motivated conduct and comparable secularly motivated conduct in a manner that devalues religious reasons for acting [which] applies not only when a coercive law or regulation prohibits religious conduct, but also when government denies religious adherents access to publicly available money or property." *Tenafly,* 309 F.3d at 169.

For the reasons discussed below, ARIN's Religious Affiliations policy cannot withstand heightened scrutiny, as there are neither compelling nor important government interests promoted by prohibiting free exercise of religion and non-proselytizing, non-coercive religious symbolic speech by employees in public schools, but not secular symbolic speech by those employees.

### D. Discrimination—Purpose and Effect of Religious Affiliations Policy

The ARIN Religious Affiliations policy is decidedly not neutral, and has both the

effect and the express purpose of discriminating against religion.

### 1. Discriminatory Effect

 ARIN's Religious Affiliations policy is not neutral in effect, and does not pretend to be. Preliminarily (as explained in section VII. E., Free Speech, *infra*), plaintiff's act of wearing her cross on a necklace outside of her clothing is symbolic speech on a matter of public concern (religion). The effect of ARIN's Religious Affiliations policy is to prohibit plaintiff and other employees of ARIN from publicly displaying and expressing (or exercising) their religious beliefs and affiliations while working. At the same time, employees may publicly display and express other secular messages through jewelry, dress, insignia and emblems while working. There can be no doubt, on the record before the Court, that the effect of the Religious Affiliations policy is to prohibit an employee's symbolic religious expression and discipline those who do not comply, while exempting employees' symbolic speech which expresses a non religious message from similar treatment.

### 2. Discriminatory Purpose

 The Religious Affiliations policy was enacted under the auspices of the Garb Statute, which, the parties agree, was motivated by anti-Catholic animus when initially enacted in 1895. *United States v. Bd. of Educ. for the School District of Philadelphia (Philadelphia Bd. of Educ.)*, 911 F.2d 882, 894–95 (3d Cir.1990) ("we have not been unmindful of the district court's finding in the present case that 'anti-Catholicism was a significant factor in the passage of the Pennsylvania religious garb bill of 1895, now codified as section 11–1112.' "). The Garb Statute was reenacted by the Pennsylvania General Assembly in 1949 when the School Code was recodified, and presumably, as defendants argue, there was no anti-Catholic animus behind the reenactment. *See id.* at 895. Nevertheless, its original design went virtually unchanged, and its effect remained hostile to religion by singling out and prohibiting only *religious* symbolic speech and expression.

### 3. Countervailing Government Interests

Such purposeful discrimination directed against and impacting upon the free exercise and expression of sincerely held religious beliefs of public employees can only be justified if there are important government interests at stake, but none have been demonstrated in this case. Defendants have shown no actual disruption of classes or school activities, no complaints by students, fellow employees or parents, and, indeed, no controversy at all caused by Ms. Nichol's wearing of her cross. Nor have defendants attempted to demonstrate, much less proven, that any such disturbances or problems are likely to occur. Mr. Truscello, who by his own accounts is "sensitive" to these matters, observed plaintiff for seven years while she wore her cross at school, and he never noticed it until April, 2003, after it had been brought to his attention through a representative of the teachers union. As this history demonstrates, the chances of disruption, distraction or confusion over such jewelry, albeit one expressing a religious viewpoint, are slim to none-it hasn't happened and it is not likely to.

At argument and the evidentiary hearing, counsel for ARIN advanced the following justifications for the Garb Statute and the Religious Affiliations policy adopted to implement the Garb Statute: Employees who wear crosses to school send a "signal that they are a member of the Christian religion. Somebody wearing a Star of

David is sending a message that they are a member of the Jewish religion." Transcript, Argument May 9, 2003, at 23; "The whole point of the [Garb] Statute is to prevent the presentation of religious emblems and symbols to students in the school.... The obvious purpose of the Garb Statute is to avoid having students having to be presented with religious symbols." Transcript, Evidentiary Hearing, May 12, 2003, at 38–39; To permit a teacher or other employee of ARIN to wear a religious symbol such as a cross causes a "very serious concern that that is a violation of the establishment clause and in turn that provides a compelling state interest in the school districts to prohibit wearing of religious garb to avoid that possibility." Transcript, Argument May 9, 2003, at 24.

In their brief, the only government interests or concerns advanced by defendants for their policy are that: (a) elementary schools are protected environments because elementary students are so impressionable (and presumably more likely to be distracted or confused than older students and employees); (b) to permit Ms. Nichol to wear the cross would subject defendants to prosecution under the Garb Statute; and (c) to permit ARIN's employees to wear religious insignia and jewelry would tread dangerously close to establishment or endorsement of religion, in violation of the Establishment Clause. The Court will address these justifications seriatim.

## (a) Elementary School Environment

■ Elementary school children as a group are more impressionable than high school or college students, to be sure. *Walker–Serrano v. Leonard,* 325 F.3d 412, 416–17 (3d Cir.2003). However, the impressionability of elementary school students is not a sufficient reason for discrim-

inating against the First Amendment rights of ARIN employees unless the employees are doing something that is likely to influence the students by exploiting their impressionability. *See Good News Club,* 533 U.S. at 113–119, 121 S.Ct. 2093.

In *Good News Club,* the Supreme Court rejected the school's argument that elementary school students' impressionability legitimately enhanced the school's Establishment Clause concerns. The Court explained that any danger that elementary school children would misperceive an endorsement of religion (if the school were to *permit* religious organizations to use its public forums to deliver religious based messages) would be no greater than the danger that they might perceive a hostility toward religion (if the school permitted other community organizations with secular messages to use the forum *but prohibited* those with religious affiliations). *Id.* at 118, 121 S.Ct. 2093. The Court simply was "not convinced that there is any significance ... to the possibility that elementary school children may witness the Good News Club's [religious content] activities on school premises, and therefore we can find no reason to depart from our holdings in *Lamb's Chapel* and *Widmar.*" *Id.* at 119, 121 S.Ct. 2093. Therefore, permitting the Club to use the school's facilities on premises would not have violated the Establishment Clause. *Id. See also Child Evangelism Fellowship v. Stafford Twsp. School Dist.,* 233 F.Supp.2d 647, 664–65 (D.N.J.2002) (where elementary schools provided various public fora for dissemination of written secular viewpoints and messages of community groups, but did not permit religious organization to use the fora to disseminate material with religious viewpoints, school district's Establishment Clause concerns were exaggerated, and its policy infringed upon the Free Speech and Free Exercise rights of the excluded students and groups).

█ Given the inconspicuous nature of plaintiff's expression of her religious beliefs by wearing a small cross on a necklace, and the fact that other jewelry with secular messages or no messages is permitted to be worn at school, it is extremely unlikely that even elementary students would perceive Penns Manor or ARIN to be *endorsing* her otherwise unvoiced Christian viewpoint, and defendants certainly presented no evidence to support such a perception. Merely employing an individual, such as plaintiff, who unobstrusively displays her religious adherence is not tantamount to government endorsement of that religion, absent any evidence of endorsement or coercion.

### (b) Exposure to Criminal Liability

█ Defendants fear criminal prosecution under the Pennsylvania Garb Statute if they permit an employee to wear a cross. However, that statute plainly does not apply to a non "certificated" instructional assistant such as Ms. Nichol, and criminal liability is not triggered if Ms. Nichol is permitted to wear her cross. If defendants were to be prosecuted under the Garb Statute, this or another court would no doubt be asked to declare the Garb Statute in violation of the First Amendment, and to enjoin any prosecution thereunder, and, for the reasons set forth herein, such a challenge would not be frivolous.

### (c) Establishment Clause Concern

█ Finally, defendants' Establishment Clause argument already has been decided against defendants. *See* section VII. D, *supra.* In *Tenafly,* a Borough ordinance prohibited placement of signs, advertisements and other matter on telephone poles, but in practice, the Borough had permitted certain items to be placed on the poles. When the Tenafly Eruv Association placed *lechis* on poles for reli-

gious purposes, the Borough ordered the Association to remove them, and it brought suit for injunctive and other relief. The Borough claimed, as does ARIN here, that its ordinance was justified by a compelling state interest in preventing a potential Establishment Clause problem.

Rejecting that contention, the United States Court of Appeals for the Third Circuit stated that "a government interest in imposing greater separation of church and state than the federal Establishment Clause mandates is not compelling in the First Amendment context." 309 F.3d at 172–73, *citing Widmar v. Vincent,* 454 U.S. 263, 276, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Analyzing several of the more recent precedents of the United States Supreme Court, *Tenafly* observed that challenged government action which treated religion neutrally would not be viewed by a reasonable, informed observer—nor, therefore, by the Supreme Court—as endorsing religion. 309 F.3d at 174–75.

A reasonable observer, i.e., one who was familiar with the history and context of ARIN's Religious Affiliations policy and its application in the schools under ARIN's authority, could not perceive that ARIN was endorsing religion by permitting its employees to wear small crosses or similar jewelry with religious content or viewpoint to work at school, especially in the context that jewelry with secular message content is worn and permitted. There is, after all, a "crucial distinction between 'government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.'" *Rosenberger,* 515 U.S. at 841, 115 S.Ct. 2510.

### (d) *United States v. Bd. of Educ. for the City of Philadelphia*

Defendants' strongest argument is that the Garb Statute, pursuant to which its

Religious Affiliations policy was promulgated, was upheld in *United States v. Bd. of Educ. for the School District of Philadelphia (Philadelphia Bd. of Educ.)*, 911 F.2d 882 (3d Cir.1990), which found that the preservation of an atmosphere of religious neutrality was a compelling state interest. The Garb Statute was enforced in that case to prohibit Alima Reardon, a Muslim teacher, upon pain of prosecution, from wearing identifiable Muslim garb which fully covered her entire body save face and hands. Pursuant to her belief, Amilia Reardon regularly wore a head scarf covering her head, neck and bosom, leaving only her face visible, and a long loose dress which covered her arms to her wrists.

Ms. Reardon mounted a Title VII employment discrimination challenge on the basis of religion, and the EEOC took up her challenge in the courts. The United States Court of Appeals for the Third Circuit held that the mandatory Garb Statute presented an "undue hardship" to the school district, which provided a Title VII defense to the apparent discrimination against religion in enforcement of the Garb Statute. However, the Court of Appeals was not faced with, and did not address, any Establishment Clause challenge. *Id.* at 894 ("We need not here address what if any importance this [undue hardship] 'significant factor' finding would have in the context of an establishment clause challenge to the statute; we have no such challenge before us.").

Moreover, in the course of discussing a First Amendment challenge to Oregon's garb statute, the Court of Appeals in *Philadelphia Bd. of Educ.* specifically and approvingly highlighted the Oregon Supreme Court's observation that *"offending dress . . . would not include dress that communicates an ambiguous message, such as, for example, the occasional wearing of* jewelry that incorporates common decorations like a cross or a Star of David." *Id.* at 890 (emphasis added).

Thus, *Philadelphia Bd. of Educ.* is factually and legally distinguishable, and does not constrain this Court from engaging in an unrestricted Establishment and Free Exercise Clause analysis. Moreover, the Court's analysis today is supported by "subsequent doctrinal developments" in the First Amendment precedent of the Supreme Court, as explicitly recognized explained by the United States Court of Appeals for the Third Circuit only last year in *Tenafly,* 309 F.3d at 173 n. 33. Elsewhere, the Court has noted that, since 1990, "the legal landscape [of Establishment Clause analysis] changed dramatically when the Supreme Court handed down its decision in *Employment Div., Dep't of Human Resources of Oregon v. Smith. . . ." City of Newark,* 170 F.3d at 362. In the current legal landscape of the Establishment Clause, it is unlikely that the Garb Statute would withstand the heightened scrutiny and endorsement analysis to which it now must be subjected.

■■■ For all of the foregoing reasons, the Court holds that ARIN's Religious Affiliations policy violates the Free Exercise Clause of the First Amendment, and that its suspension of Ms. Nichol pursuant to that policy cannot stand.

### E. Free Speech

■■■ Now turning to Ms. Nichol's Free Speech challenge, there is significant overlap between the analysis of the Free Exercise of Religion and Free Speech Clauses of the First Amendment where, as here, the speech expresses a religious viewpoint. Turning to Ms. Nichol's Free Speech challenge, employees of federal and state governments do not relinquish their First Amendment rights to speak on matters of public concern as a condition of

their government employment. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Nor, as plaintiff correctly asserts, do "students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), *quoted in Brown v. Armenti*, 247 F.3d 69, 74 (3d Cir.2001). However, while public employees do not give up all of the First Amendment rights they enjoy as citizens, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 563, 88 S.Ct. 1731.

The familiar *Pickering* balance of public employer and employee interests is well established, and was summarized recently by the United States Court of Appeals for the Third Circuit as follows:

> When an adverse employment action is taken against a public employee due to the employee's speech, the threshold question is whether the employee's speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146[, 103 S.Ct. 1684, 75 L.Ed.2d 708] (1983); *see also Rankin v. McPherson*, 483 U.S. 378, 383[, 107 S.Ct. 2891, 97 L.Ed.2d 315] (1987).
>
> Consequently, where a "public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a [government employer's] personnel decision." *Id.* at 147[, 103 S.Ct. 1684]. On the other hand, if the

speech relates to a matter of public concern, a court must arrive at a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 142[, 103 S.Ct. 1684]. In performing this balancing, the manner, time, place, and entire context of the expression are relevant. *Connick*, 461 U.S. at 150[, 103 S.Ct. 1684]. Pertinent considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." ... The Court has described this balancing process as requiring "a fact-sensitive and deferential weighing of the government's legitimate interests." *Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 677[, 116 S.Ct. 2342, 135 L.Ed.2d 843] (1996).

*Swartzwelder v. McNeilly*, 297 F.3d 228, 235 (3d Cir.2002) (parallel and certain other citations omitted).

### 1. Threshold Questions

As *Connick* held, a threshold inquiry is whether the employee's speech can fairly be considered to have been on a matter of public concern. In this case, however, there is another threshold that must first be crossed—was it speech?

### 2. Symbolic or Expressive Speech

The parameters and contours of this threshold question have been thoroughly mapped by the United States Court of Appeals for the Third Circuit, and will not be repeated herein. *See Troster v. Pennsylvania State Dep't. of Corrections,*

65 F.3d 1086 (3d Cir.1995), *cert. denied* 516 U.S. 1047, 116 S.Ct. 708, 133 L.Ed.2d 663 (1996) (requiring a state corrections officer to wear a flag patch on his uniform does not force him to participate in symbolic speech or compelled expression, and in fact, communicates no message at all under all of the circumstances); *Tenafly,* 309 F.3d at 159–65 (affixing "lechis," a religious item designating certain boundaries important to Orthodox Jews, to telephone poles was not symbolic speech).

Suffice it to say there is little doubt that, under the *Troster/Tenafly* analysis, the visible wearing of a cross or star of David is symbolic or expressive speech by the wearer which conveys her personal religious beliefs or affiliations. *See Chalifoux v. New Caney Ind. School Dist.,* 976 F.Supp. 659, 665–66 (S.D.Tex.1997) (plaintiffs' wearing rosary beads around their necks communicated their Catholic faith, and was clearly protected symbolic speech; court notes that the crucifix "is recognized universally as a symbol of Christianity"); *but see Daniels v. City of Arlington,* 246 F.3d 500 (5th Cir.), *cert. denied* 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001) (police officer's wearing small crucifix on uniform was not deemed symbolic speech).

If there were any doubt, it would be dispelled by the Pennsylvania Garb Statute itself and by ARIN policy, both of which are designed and applied by ARIN to prevent communication at school of an employee's personal religious beliefs or her Religious Affiliations. Additionally, counsel for ARIN argued that the wearing of a cross sends a signal that the wearer is "a member of the Christian religion." Transcript, Argument, May 9, 2003, at 23. It is inconsistent of defendants to simultaneously maintain that wearing a cross is not speech at all.

The Court holds, therefore, that under the circumstances and in the context pre-sented, plaintiff's visible display of her cross jewelry is symbolic speech expressing her religious beliefs or religious viewpoint.

### 3. Matter of Public Concern

"Only a *subset of speech* that is protected for citizens is also protected for public employees: *i.e., public concern speech.*" *Azzaro v. County of Allegheny,* 110 F.3d 968, 976 (3d Cir.1997) (emphasis added). The Supreme Court of the United States has held that "First Amendment rights are implicated *only* when a public employee's speech relates to matters of public concern." *Sanguigni v. Pittsburgh Bd. of Public Educ.,* 968 F.2d 393, 397 (3d Cir.1992) (emphasis added). Before a *Pickering* balance may be conducted, therefore, it is incumbent upon the Court to determine if the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." *Rankin,* 483 U.S. at 384, 107 S.Ct. 2891, *quoting Connick,* 461 U.S. at 146, 103 S.Ct. 1684; *Azzaro,* 110 F.3d at 976; *Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995); *Swineford v. Snyder County,* 15 F.3d 1258, 1270 (3d Cir.1994).

A public employer is relatively (although not absolutely) unrestrained in regulating speech of its public employees unless that speech crosses the "public concern" threshold. The determination of whether a public employee's speech fairly relates to "any matter of political, social, or other concern to the community," *Connick,* 461 U.S. at 146, 103 S.Ct. 1684, is a legal one, "to be determined by the content, form and context of a given statement, as revealed by the whole record." *Watters,* 55 F.3d at 892, *quoting Connick,* 461 U.S. at 147–48 & n. 7, 103 S.Ct. 1684. *See also Rankin,* 483 U.S. at 384–85, 107 S.Ct. 2891; *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996) ("The public con-

cern inquiry is a legal one, to be determined by reference to the 'content, form, and context' of a given statement.").

### (a) Content

"Public concern" is a term of art as employed at the *Pickering* threshold, and more often than not, the subset of public concern speech is measured more by what it is not than by what it is. Examination of public concern cases, starting with *Connick*, reveals a judicial pattern: speech tends to be deemed "fairly related to a matter of public concern" so long as the public employee's speech is not merely about "mundane employment grievances" exclusively of interest to the affected employee, or nearly so. *Sanguigni*, 968 F.2d at 393 (collecting and comparing categories of speech found to be on matters of public concern with those which were not).

"When government employees comment on matters outside the issues of their workplace, they are more likely to be perceived as commenting on matters of public concern, for they are seen as making comments in the general marketplace of ideas, exercising free expression like any other citizen." *Smolla and Nimmer on Freedom of Speech*, Ch. 18, Speech of Government Employees, § 18.10 (West 2003). On the other side of the public concern coin, and presenting more complexity, are employees' comments directed internally at issues in or affecting the workplace, ranging from idle office gossip and chit-chat (usually not public concern speech) to comments about safety, performance, corruption and other such larger issues of general interest to the public (usually deemed to be matters of public concern). *Id.* Indeed, some courts have "defined public concern speech broadly to include almost any matter other than speech that relates to internal power struggles within the workplace." *Tucker v. California Dep't. of Educ.*, 97 F.3d 1204, 1210 (9th Cir.1996) (citations omitted). This approach appears to be entirely consistent with the "mundane employment grievances" categorical approach taken by the United States Court of Appeals for the Third Circuit in *Sanguigni* and *Azzaro*.

As discussed in Section VII. C. 4., the content or, perhaps more precisely, the viewpoint of plaintiff's symbolic speech is religious, i.e., a non-verbal expression of her Christian faith and belief in Jesus as her Lord and Savior. Content and viewpoint based restrictions on Free Exercise and Free Speech are ordinarily subject to the strictest of scrutiny. *See Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 546, 113 S.Ct. 2217; *Employment Div., Dept. of Human Resources of Oregon*, 494 U.S. at 884, 110 S.Ct. 1595. "[P]rivate religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). *See also United States v. National Treasury Employees Union*, 513 U.S. 454, 466–67, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (applying *Pickering* test to protect employees' outside speech on a number of matters, including one employee's speech about the Quaker religion, against legislative ban on honoraria paid to public employees, which ban was stricken as a broad categorical prohibition of free speech on matters of public concern).

In *Tucker*, the United States Court of Appeals for the Ninth Circuit performed the threshold analysis where a computer analyst for the California Department of Education sued to enjoin it from enforcing its ban against any religious advocacy at the workplace. In rejecting the state's contention that private religious advocacy

by an employee is not public concern speech, the Court reasoned as follows:

> This circuit and other courts have defined public concern speech broadly to include almost any matter other than speech that relates to internal power struggles within the workplace.... In *National Treasury Employees Union v. United States,* 990 F.2d 1271 (D.C.Cir. 1993), *aff'd in relevant part, rev'd in part on other grounds,* 513 U.S. 454[, 115 S.Ct. 1003, 130 L.Ed.2d 964] (1995), the D.C. Circuit [Court of Appeals] wrote:
>
>> The contrast, [between public concern speech and non-public concern speech], then was between issues of external interest as opposed to ones of internal office management. Accordingly, we read the "public concern" criterion as referring not to the number of interested listeners or readers but to whether the expression relates to some issue of interest beyond the employee's bureaucratic niche.
>
> ... The Supreme Court has also made it clear that an employee need not address the public at large, for his speech to be deemed to be on a matter of public concern. *See Rankin v. McPherson,* ... (employee statement made only to co-worker concerning President Reagan was speech on a matter of public concern). *Here, the speech is religious expression and it is obviously of public concern.*

97 F.3d at 1210 (emphasis added; parallel and certain other citations omitted).

There is no doubt that the religious content or viewpoint of plaintiff's symbolic speech makes it a matter of public concern relating to social or community interests, as contrasted with speech about "mundane employment grievances" expressing personal employment complaints and office critiques important only (or primarily) to the speaker, as discussed in *Connick* and its public concern progeny. Plaintiff's symbolic non-verbal speech is an expression of her personal religious convictions and viewpoint, which is a matter of social and community concern entitled to the full protection of the First Amendment. The content of plaintiff's symbolic speech, therefore, inclines it toward a finding of public concern speech.

**(b) Form**

As previously discussed, plaintiff's wearing a cross on a necklace is symbolic speech commonly perceived as expressing a Christian faith or viewpoint. This symbolic expression is not advanced in a public forum for speech (like an auditorium), but neither is it merely a shared communication between plaintiff and other like-minded co-workers. The form of plaintiff's speech does not appear to be a significant factor in the public concern equation.

**(c) Context**

Placing plaintiff's symbolic speech in context also tilts the determination toward public concern speech. Plaintiff was not simply disciplined after an administrative adjudication or executive decision finding that her speech was disruptive of the workplace or caused some other problem for the employer, as most of the *Pickering* cases seem to be, but rather, she was suspended pursuant to ARIN's categorical, content-based, Religious Affiliations regulation prohibiting religious symbolic speech but not other kinds of symbolic speech. Such categorical and content-driven regulation of speech is inherently suspect because it applies to a broad range of employees and impacts (i.e., chills) more than one employee's expression of beliefs.

Moreover, plaintiff's symbolic expression is not made in the context of an employment grievance, either mundane and per-

sonal or of more general interest in the workplace. Instead, this expression is a long-standing practice by plaintiff of her religious beliefs. This has nothing to do with the employment environment or the terms or conditions of employment, except indirectly to the extent the public employer now has prevented plaintiff from expressing her religious beliefs while at work. Nor does the private nature of plaintiff's expression of beliefs to co-workers, visitors, administrators and students who may notice and appreciate the significance of her cross wearing disqualify it from the protection afforded by the First Amendment to matters of public concern.

### (d) Determination

■ While the form of plaintiff's speech is neutral, its content and its context strongly indicate that this symbolic expression goes to a matter of public concern, and the Court so finds. Having crossed the last threshold, therefore, the Court proceeds to the *Pickering* balance of interests.

### 4. The *Pickering* Balance

■ The discussion in Section VII. D. effectively resolves the *Pickering* balance in plaintiff's favor. A public employer must make a "substantial showing that the [public employee's] speech is, in fact, likely to be disruptive." *Watters v. City of Philadelphia,* 55 F.3d 886, 896 (3d Cir. 1995), *quoting Waters v. Churchill,* 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). Pertinent considerations on the employer's side of the scale include speech which impairs discipline by superiors or harmony among co-workers, detrimentally impacts close working relationships, or impedes the performance of the speaker's duties or interferes with the regular operation of the employer's business.

There are no valid government interests served by enforcing the Religious Affiliations policy to ban the wearing of small items of jewelry expressing a religious viewpoint, in the absence of any direct or indirect attempted coercion or indicia of endorsement of such viewpoint by ARIN. Plaintiff's wearing her cross has not been disruptive, controversial (until banned by ARIN), distracting or confusing to students, nor has it caused any dissension or problems in the working or school environment. There is no evidence—nor even an allegation—that it causes any interference with ARIN's operations. Further, there is no danger that permitting an ARIN employee to wear a cross while working at school will encroach upon the Establishment Clause.

■ On the other hand, employees are prevented from quietly expressing their personal religious views or beliefs by wearing items of jewelry imbued with religious meaning. This is a broad category of content and viewpoint based discrimination. Such categorical restrictions on public employees' speech are presumptively invalid. *Police Dep't. of City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *see also Sypniewski v. Warren Hills Regional Bd. of Educ.,* 307 F.3d 243, 260 (3d Cir.2002). Defendants have not overcome the presumption in this case.

It is apparent that plaintiff has a strong likelihood of success on the merits of her Free Speech claim, in addition to her Free Exercise claim.

### VIII. Irreparable Injury

■ Contrary to defendants' position, the fact that plaintiff may suffer no immediate financial harm, because it has agreed to pay her at least through the end of the school year, is not dispositive, as the First Amendment recognizes and protects valuable but not easily quantified rights. Limitations on the free exercise of religion and free speech, even for minimal periods

of time, constitute irreparable harm. *Tenafly*, 309 F.3d at 178, *quoting, inter alia, Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

## IX. Balance of Harm to Plaintiff Versus Harm to Defendants

■ Defendants will suffer little or no harm if the Court grants this preliminary injunction. They are not subject to criminal prosecution under the Garb Statute, there is no showing of actual or threatened disruption, disturbance or other danger at Penns Manor in permitting plaintiff to wear her cross during the remainder of this litigation, and as we have seen, there is no likelihood that defendants' permitting plaintiff to wear her cross visibly while at work would violate the Establishment Clause.

## X. Public Interests

■ Where there is no compelling state interest to justify a burden on religious freedom, "the public interest clearly favors the protection of constitutional rights." *Tenafly*, 309 F.3d at 178, *quoting Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 884 (3d Cir.1997).

## XI. Conclusion

■ The Court will grant plaintiff's request for a preliminary injunction enjoining enforcement of ARIN's Religious Affiliations policy pending disposition of her request for a permanent injunction (hearing scheduled for August 28, 2003), and ordering defendants to reinstate her to her former position with full back pay and benefits. For all of the foregoing reasons, the Court also will deny defendants' motion to dismiss.[1]

Defendants agreed at the hearing that they would not demand a bond in the event the Court ruled in plaintiff's favor, and accordingly, bond will be waived.

---

1. Plaintiff's complaint also challenges the Garb Statute and the Religious Affiliations policy under the free exercise of religion clauses of the Pennsylvania Constitution and the newly enacted Pennsylvania Religious Freedom Protection Act, 71 Pa. Stat. Ann. § 2401, *et seq.*, Act of December 9, 2002, P.L. 1701, No. 214, § 1, *et seq.*, effective immediately. The 1895 predecessor to the current Garb Statute was upheld against a similar state constitutional challenge by the Supreme Court of Pennsylvania in *Commonwealth v. Herr*, 229 Pa. 132, 78 A. 68 (1910), and this Court is not at liberty to reconsider that vintage ruling.

 The Pennsylvania Religious Freedom Protection Act of 2002 has not been judicially interpreted and this Court is hesitant to sail the uncharted waters within its reach. In any event, as defendants contend, it does not appear that plaintiff provided proper notice to the agency imposing the alleged substantial burden on the free exercise of religion (i.e., to ARIN), as required by section 5(b) of that Act, 71 Pa. Stat. Ann. § 2405, and defendants do not suggest that the Court should address this state statutory claim first, in order to avoid the First Amendment issues. Accordingly, the Court does not address plaintiff's claim under Pennsylvania's Religious Freedom Protection Act.